IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE<br><br>VAQUERIA LAS MARTAS INC.<br>EIN #66 0541863<br><br>Debtor-In-Possession | BANKRUPTCY 18-07304 ESL<br><br>CHAPTER 12 |

**MOTION TO DETERMINE THAT MILK SALE PROCEEDS ARE NOT CASH COLLATERAL, OR IN THE ALTERNATIVE, REQUEST TO USE CASH COLLATERAL TO AVOID CONTINUING HARM TO THE ESTATE PENDING FINAL HEARING PURSUANT TO §363(c)(2) & FED. R. BANKR. P. 4001(b)(2)**

COMES NOW Debtor VAQUERIA Las Martas Inc. by and through its counsel of record and moves this Honorable Court for an Order determining that its daily post-petition sale of Milk Quota is not cash collateral of any party, and particularly not of Condado 5, or in the alternative to authorize the use of such collateral.

## I. INTRODUCTION

This motion is based on supporting documents on file herein, notably Exhibits #1 to #4. Exhibit #1 are the MORs for 6 months prior to petition date, or from June to November 2018 and a Summary of the 6 months included therein; Exhibit #2 Projections from December 2018 to April 2019 with Notes to the Projections; Exhibit #3 Production & Spending Table; Exhibit #4 Income & Expense Statement.

Reference and incorporation is made herein, particularly to two of the exhibits attached to Condado 5's *Motion to Prohibit Use of Cash Collateral* filed at doc #22 at Exhibits #3 and #4 that include the UCC Financing Statements #2005005313 and #2005006312.

The exhibits from Condado 5's *Motion to Prohibit Use of Cash Collateral* filed at doc #22 appear to have lapsed pursuant to §9-515 Chapter 9 Secured Transactions Law 21 of January 17, 2012. For the purposes of this motion, debtor asserts that both UCC Statements have lapsed, but also argues in the alternative, without waiving this defense and subject to a finding by the Court as raised at doc #28 and in this motion, that the UCC have in fact lapsed, and/or that the milk quota is in fact not cash collateral.

1

1.      Debtor filed for protection under chapter 12 on December 14, 2018 under prior counsel whose withdrawal from debtor's legal representation was approved by the Court on January 14, 2019 at doc #13.  Debtor appeared through new counsel in that of the undersigned on February 16, 2019 at doc #19, employment which was approved by the Court on January 26, 2019 at doc #25.

2.      Debtor is a corporation dedicated to the operation of a dairy farm organized pursuant to the laws of the Commonwealth of Puerto Rico since 1998. Debtor operates from a leased property located at Naranjito Ward, State Road #422, Km. 8.3 Hatillo, Puerto Rico, property which is owned by Juan M. Barreto Ginorio, President of the corporation.

3.      Vaqueria Las Martas operates pursuant to license number 3064 and owns a bi-weekly milk production quota of 58,700 cuartillos, entirely pledged to Condado 5, previously BPPR, in first rank.

4.      Condado 5 also holds a mortgage interest as guarantor over debtor [18-07310], Juan M. Barreto Ginorio's residence in Bo. Hato Abajo, SR 653 Km. 3.3., Arecibo and over his 27.4842 cuerda dairy farm in Barrio Naranjito, SR 492 Km 0.9, Hatillo, Puerto Rico, as well as third-party guarantor, JM Dairy Inc., a related corporation, on the Notes held by Condado 5.

5.      Debtor's business solvency and capacity to cover ever increasing costs in production of milk has experienced serious financial set-backs, especially during the last 14 months in which it has not had access to any of the proceeds of its milk production subject entirely to Condado 5's liens.  The assignment of the entire milk production to one creditor, Condado 5, has forced debtor to operate virtually without any compensation or income for its hard labor and toil, nor resources for the high operational costs common to dairy farms in Puerto Rico, but for intermittent incentives and the help of family.  These circumstances have resulted in debtor cutting back on much-needed animal feed and care for the livestock and for the dairy farm which in turn has diminished milk production.

6.      The after-math and impact of Hurricanes Irma and Maria has further exacerbated the exigent circumstances under which debtor has been forced to operate for over a year.  Debtor

2

has also been victim of the continued cost of diesel for a generator to power the dairy farm to this day since the hurricanes in September of 2017. Power to the dairy farm has not been restored due to fallen power lines and posts yet to be repaired by the Puerto Rico Electric & Power Authority to allow use of electricity in the operation of the dairy farm. Needed repairs caused by the Hurricanes have not been attended to for the same critical need of the funds paid as cash collateral.

7.      Debtor's inability during more than 14 months to replace and purchase cows for the dairy farm has drastically curtailed milk production, and has not allowed debtor to meet the high cost of the concentrated feed needed to allow for an increase in milk production. Feed is required not only of the milking cows, but also the dry cows, pregnant heifers, calves and bulls. The quality and quantity of feed impacts the production of raw milk and is generally the largest expense in a dairy farm.

8.      Debtor requires use of the entire cash collateral, *albeit* on an interim basis, if in fact it is determined to be cash collateral, to purchase livestock to reinforce and increase the current production line to avoid diseases in the herd and to maintain the quality of the milk production required by the regulatory agencies. The cash collateral is also needed to inject funds into the operation of the dairy farm as a whole in order to save it from spiraling losses and to increase its production to be able to repay its largest creditor Condado 5 and its other creditors.

9.      Debtor is struggling to stave off starvation of the cows already in production, by reducing feeding its animals to a minimum. This reality has caused and will continue to cause further decline in production. Therefore, the need for an effective reorganization effort under chapter 12 of the Bankruptcy Code.

**A.      *Remedies Sought***

10.      In what follows, debtor will argue and prays in first instance:

a)      for a determination that the post-petition milk production, as after-acquired property is not cash collateral under §522(b);

b)      that the UCC Financing Statements executed in 2005 have lapsed pursuant to §9-

3

515 Chapter 9 Secured Transaction Law 21 of January 17, 2012; in the alternative

c)      allow on an interim basis the bi-weekly use of 100% of the cash collateral obtained from the raw milk purchased by Suiza Dairy Inc. which has been averaging and fluctuating at $10,577 every 28 days during the 6 months prior to the petition, with 42 milking cows at 11.51 liters per day per cow, averaging 6,768 liters bi-weekly;

d)      allow for the lease of part of the unused milk quota of 58,700 liters for $4,000 monthly for 20,000 liters of milk every 14 days at .10 cents por liter.  The rent of $2,000 bi-weekly additional revenue is greatly needed to purchase cattle to bolster the farm's operations and milk production.  Upon approval by this Court, the proposed lessee is Milk Money, Inc. of PO Box 848, Hatillo 00659, represented by its President, Luis S Martinez Rivera.

11.      With the authorization from this Court for the use of 100% of the cash collateral, debtor's milk production should begin to increase and stabilize within approximately two months.  It is easier to decrease milk production from one day to the next by reducing feed intake, but it takes longer to increase milk production as cows nearing their resting period will not necessarily increase production despite increase in feed intake.  When feed intake is reduced, the effect on close to resting cows is to flatten their lactation curve at a more rapid rate. Close to calving cows or mid lactation cows will recover milk yield but their lactation curve will not peak had their feed intake not been interrupted or diminished.  Consequently, the March and April projections at Exhibit #2 do not increase above 11 and 11.5 respectively.

12.      Use of the totality of the cash collateral for at least a year will avoid the continued, immediate and irreparable damage that is being caused to the estate by the assignment of the entire milk production to Condado 5, at least until a final hearing on this matter and/or until a Plan is confirmed, whichever is later.  Debtor is averaging production of 6,768 liters bi-weekly which represents 11.51% of its milk quota. Refer to **Exhibit #1** Summary of 6 months MORs.

13.      With immediate access to cash collateral, within the fifteen (15) day period prescribed by Fed. R. Bankr. P. 4001(b)(2) or until at least a chapter 12 Plan is confirmed, debtor

4

will be able to operate, reorganize its finances and recover an increase in milk production which will benefit creditors and provide funding for the chapter 12 Plan, *albeit* on an interim basis until the chapter 12 Plan is confirmed.

14.    A hearing is requested to allow Condado 5 the opportunity for hearing after the 15-day period prescribed by Fed. R. Bankr. P. 4001(b)(2) elapses.

## II.  Background

### A.    *Nature of the Funds*

15.    In the course of a business day, Debtor sells its milk production to Suiza Dairy.  It is paid to produce milk every 14 days in 28-day cycles.  The price paid for milk production in Puerto Rico fluctuates at a rate of .75 cents up to .80 cents per liter and varies from month to month. At the moment debtor is averaging production of 309 liters daily which is 4,325 liters in a bi-weekly period.  Refer to Summary of MORs for June to November 2018 at **Exhibit #1.**

16.    Debtor has a variety of loans and debt.  Schedule D shows $1.632,010 in secured debt. Of this, approximately $1,619,500 is for loans incurred prior to 2005 for the purchase of real estate and operation of the dairy farm financed with Banco Popular of Puerto Rico [BPPR], now Condado 5, with a senior lien on the Milk Quota of 58,700 liters.[1]  Debtor also owes USDA Farm Service for the purchase of cattle and for continued operation of the dairy farm incurred in 2010, with a balance owed to date of $12,510 as per claims on file for both creditors at claims #6 and # 2 respectively.

17.    Condado 5's cross collaterized loans are styled in the sale of future receivables by the lender and pledged as a percentage of general receipts and payment of the Milk Quotas from Suiza Dairy.[2]

18.    As pledged, Condado 5 has the right to intercept 100% of the entire Milk Quota,

---

[1] UCC Financing Statement appears to have expired under §9-515 Chapter 9 Secured Transaction Law 21 of January 17, 2012.

[2] Condado 5 also holds mortgages over guarantor's [Juan M Barreto Ginorio] real properties & JM Dairy Inc.

or 58,700 liters[3] valued at $704,400 and USDA has a pre-petition and valid UCC security interest

on equipment and cows, value which exceeds its claim of $12,509.56.

### III.  Law

### a.  Post-Petition Receipts or After-Acquired Property Are Not Cash Collateral

19.     "Cash Collateral" is a term of art in Bankruptcy law and refers to proceeds of

other property in which a creditor holds a security interest, 11 USC §363(a).

20.     While creditor Condado 5 here might have security interests in the ongoing

transactions under state law, this security interest does *not* apply to post-petition property, or

'after-acquired' property:

> *Except as provided in subsection (b) of this section, property acquired by the*
> *estate or by the debtor after the commencement of the case is not subject to any*
> *lien resulting from any security agreement entered into by the debtor before the*
> *commencement of the case.*

11 USC §552(a)

None of the sections of §552(b) apply, save for Debtor's equipment and cows pledged to USDA,

which is discussed below and will be fully paid its secured claim.

21.     Debtor receives payment to produce milk on simultaneous milk production; it has

no receivables or other pre-petition entitlements. The very nature of this property is that it is not

created until received, or until the cows are milked on the same day as taken to market.

22.     As such, all such Milk Quota transactions are post-petition or 'after-acquired'

property; they depend upon the work of employees in milking the cows to send to market in that

of Suiza and the expenditure of producing the post-petition milk to allow for payment of the

Milk Quota.

23.     The Ninth Circuit Bankruptcy Appellate Panel has considered this question:

> As a general rule, post-petition revenue is not cash collateral. Under § 552(a), a
> creditor's prepetition security interest does not extend to property acquired by the
> debtor post-petition even if there is an "after acquired" clause in the security
> agreement. 11 U.S.C. § 552(a). The purpose of § 552(a) is "to allow a debtor to

---

[3] Refer to footnote #1.

6

gather into the estate as much money as possible to satisfy the claims of all creditors." *Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.),* 944 F.2d 500, 502 (9th Cir. 1991); *Financial Sec. Assurance v. Days Cal. Riverside Ltd. P'ship. (In re Days Cal. Riverside Ltd. P'ship),* 27 F. 3d 374, 375 (9th Circ. 1994); *Arkinson v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.),* 316 B.R. 330, 335 (9th Cir. BAP 2004).

*In re Premier Golf Properties, LP,* 477 BR 767 at 762 (9th Cir. BAP, 2012)

24.  The court further analyzed this in light of its prior *Zeeway* opinion:

In 1987, the Ninth Circuit Bankruptcy Appellate Panel (BAP) articulated a general test for determining whether income from real property constitutes rents:

If the income is produced by the real property, it is considered rents; but if the income is the result of services rendered or the result of the specific business conducted on the property, then it does not constitute rents. *In re Zeeway Corp., 71 B.R. 210 at 211-12.*

In applying its test, the BAP concluded that gate receipts generated by post-petition races at the debtor's racetrack were not within the scope of rents subject to the creditor's deed of trust because the income was not produced by the occupancy or use of the real property, but by the services that the raceway provided. *Id.*

Courts have applied the *Zeeway* test in deciding if a debtor's income from its business operations is rent within § 552(b). Prior to 1994, "rents" was included in the § 552(b)(1) exception and there was a long-running dispute in the courts about whether hotel revenues were rents. *See, e.g., In re S.F. Drake Hotel Assocs.,* 131 B.R. 156, 159-60 (Bankr.N.D.Cal.1991) *aff'd,* 147 B.R. 538 (N.D.Cal.1992); *Greyhound Real Estate Fin. Co. v. Official Unsecured Creditors' Comm. (In re Northview Corp.),* 130 B.R. 543, 548 (9th Cir. BAP 1991).

However, the addition of § 552(b)(2) resolved the dispute by treating hotel room revenue the same as rents. Nevertheless, courts continue to confront the question of what constitutes rents in non-hotel cases and refer to pre-1994 case law analysis regarding whether a debtor's income was produced by the real property or by the services on the property.

*supra, at 774.*

25.  In the U.S. Supreme Court's holding in *Local Loan Co. v Hunt,* 292 U.S. 234 (1934), the Court barred "the creation of an enforceable lien upon a subject not existent when the bankruptcy became effective or even arising from, or connected with, preexisting property, but brought into being solely as the fruit of the subsequent labor of the bankruptcy." *Id.* At 243; see *Smoker v. Hill & Assocs.,* 204 B.R. 966 (N.D. Ind. 1997) (affirming bankruptcy court's finding

debtor's post-petition insurance commissions subject to creditor's lien pursuant to §552(b)(1).

Moreover, "[t]he passage of §552 broadened the scope of the *Local Loan* holding to extinguish

all liens on after-acquired property, subject to certain exceptions." *In re Cafeteria Operators,*

*L.P.,* 299 B.R. 400, 405 (Bankr. N.D. Tex 2003).

26.     In the case of *In re Inman*, 95 B.R. 479 (Bankr. W.D. Ky. 1988) the court

concluded that while a lender held a pre-petition security interest in a debtor's inventory, the

money generated by the operation of the restaurant converting the inventory into sale of food

was a service. *Id.* At 480-81.  Accordingly, the court held restaurants sell services, and profits

generated by converting the inventory into food fit for human consumption constituted after-

acquired property, rather than proceeds of the restaurant's inventory. *Id.* At 481.

27.     The Debtor's business is much like a golf course or a race track, or like a

restaurant that sells its services in this regard:  it relies on the physical facilities, but the

customers are paying for the services generated by the actions of employees.  Dairy farmers

through their employees, care, feed, maintain and milk the cows to allow the almost daily

delivery and production of Milk to the market. The production of milk and its delivery to market

is similarly distinguishable from hotels, for which the usage of the property is the primary

purpose.

28.     The secured creditor has the burden of proving that its lien survives 11 U.S.C.

§552. See, e.g. *Official Comm. Of Unsecured Creditors v. UMB Bank, N.A. (In re Residential*

*Capital, LLC),* 501 B.R. 549 (Bankr. S.D.N.Y. 2013).

29.     Secured creditors must establish two requirements under §552(b): 1) that the

parties entered into a prepetition security agreement extending to after-acquired property, and 2)

the after-acquired property must fit within the enumerated categories of proceeds, products,

offspring, profits, or rents under §552(b). *T-H New Orleans Ltd. P'ship v. Financial Sec.*

8

*Assurance (In re T-H New Orleans Ltd. P'ship),* 10 F. 3d 1099, 1104 (5th Cir. 1993).

**B.      *In the alternative, Use of Cash Collateral is requested under §363(c)(2) &(e)***

30.      Other than the right to compensation under §330, Debtor has the rights and powers of a trustee under the Bankruptcy Code, §1203.  The debtor may operate its business pursuant to §1203.  The Debtor in Possession may enter into transactions in the ordinary course of business and use property in the ordinary course of business unless the Court orders otherwise, §363(c)(1).  The ability to so operate is conditioned when the assets are under lien and there is Cash Collateral involved.  The right to use Cash Collateral is authorized by §363(c)(2), which provides that Cash Collateral may be used if each entity that has an interest in such Cash Collateral consents, or if the Court authorizes such use after notice and a hearing.

31.      Notwithstanding the objection of a party with an interest in the Cash Collateral, the Court may, pursuant to §363(e) authorize the use of the Cash Collateral if the party with the asserted interest is provided with adequate protection for its interest in the collateral.  Moreover, where the secured creditor's interest in the Cash Collateral is adequately protected, the policy and provisions of the Bankruptcy Code mandate the authorization of the use of Cash Collateral, see *Mbank Dallas, N.A. v. O'Conner (In re O'Conner),* 808 F.2 1393 (10th Cir. 1987); *Chrysler Credit Corp v. Ruggiere (In re Geoerge Ruggiere Chrysler Plymouth, Inc.)*, 727 F.2d 1017 (11th Cir. 1984).

32.      The concept of adequate protection is described in 5 Norton Bankr. L & Prac. 3 §94:7, as follows (internal citations omitted):

> Adequate protection is designed to protect an entity with an interest in property of the estate against an unconstitutional taking of its property interest through suspension or abrogation of its right to look to its collateral to repay the debt . . . Adequate protection is compensatory . . .. The form of protection is flexible and may include a replacement lien, periodic payments, or any other method that provides the creditor with the "indubitable equivalent" of its interest in the property.

33.      Reference is made to §1205 for the establishment of the form of adequate

9

protection. Periodic cash payments may be made to the extent that the use of Cash Collateral under §363 results in a decrease in the value of an entity's interest in property of the estate; or the grant of a replacement lien to the extent that the use of Cash Collateral results in a decrease in the value of the entity's interest in such property, or the grant of such other relief (other than compensation under §503(b)(1) as an administrative expense), including paying such entity for the use of farmland the reasonable rent customary in the community where the property is located, based upon the rental value, net income, and earning capacity of the property, as will result in the indubitable equivalent of such entity's interest in the property.

34.     In this case, the appropriate form of adequate protection for the real property that secures Condado 5's lien is either a substitute lien or periodic payments to protect a decline in real property value that is being used for the operation of the dairy farm, or a reasonable rent for the comparable farmland property, which in debtor's opinion is estimated at approximately **$300** weekly rent, or **$1,300** monthly.

35.     Debtor has appraised its real property and the value of both the real estate and the Milk Quota are under secured in relation to the balance owed to Condado 5. There is no equity cushion at this time, but it is expected that the collateral in both the real property of 27.4842 cuerdas and structures[4] [3rd party guarantor] at Barrio Naranjito, Hatillo, and residence[5] [3rd party guarantor] at Barrio Hato Abajo, Arecibo and the 58,700 liters[6] of the Milk Quota pledged to Condado 5 [previously BPPR] will not continue to depreciate in value after the depreciation suffered by real estate in Puerto Rico in years past and after Hurricanes Irma and Maria in 2017. In debtor's opinion Condado 5's claim is secured to the extent of approximately $1,017,400 in collateral, should the Milk Quota be determined to be cash collateral.

36.     In the alternative, that the Court determine that the Milk Quota is not cash

---

[4] 27.4842 cuerdas appraised at $54,940 + structures & equipment $53,060 are property of guarantor at Bo. Naranjito, Hatillo.

[5] Residence appraised at $205,000 is property of guarantor at Bo. Hato Abajo, Arecibo.

[6] 58,700 Milk Quota is valued @ $12 at petition date, or $704,400 is property of this debtor.

collateral, or that the UCC has lapsed, the value of the collateral secured by Condado 5's liens is $313,000. The total owed to Condado 5 at petition date is $1,619,500.29 with interest accrued of $6,412.30 as per claim #6.

37. In the case of USDA, adequate protection should not be required since this creditor is over-secured in that of: 32 Holstein Milk Cows at $1,200 each, a Milk Tank valued at $3,000, a Massey Tractor Ferguson 1085 [in disrepair] at approximately $3,000, if any value; another Massey Tractor Ferguson 3090 valued at $3,000; and 23,600 liters of milk production in second rank, value estimated at $72,000 at $12.00 per liter.

38. USDA is projected to be paid 100% of its claim of $12,510 under the Chapter 12 to be proposed, at $233.22 monthly which includes 4.5% interest.

39. It is projected that Condado 5 is under-secured in the pledge in first rank and USDA is fully secured, as its liens extend to part of the equipment and cows.

40. To obtain maximum payment for its milk quota, factoring in the lease of 20,000 liters of milk quota and a 46% liquidation/payment factor at a maximum pricing level of the milk, debtor needs to purchase at least 48 fresh or close to calving cows averaging 14 liters of milk per day. This in turn, with the purchase of such 48 cows, an increase of approximately 24.31% in milk production, from 4,325 liters every 14 days to 13.733 liters every 14 days. Accordingly, an increase in gross raw milk sales income from $3, 287 to $10,437 bi-weekly or $6,547 every 28 days.

41. Although debtor has employed several alternatives to maintain milk production, the same have not provided the needed results to continue with the operation of the dairy farm. These events have reduced debtor's capacity to provide proper concentrated feed and care to its current cattle in production line and invest to maintain and keep up the farm properties viable and in a healthy and vibrant production.

42. The projections submitted herein are intended to be used as guidelines for the business of the dairy farm. Nonetheless, the same can be affected by different scenarios, one of which is the fluctuating liquidation price each month, death of cows, the weather and others.

43.    To the extent milk production increases, there will also be an increase in feed costs such as grains, Malta, hay and so forth. At this time feed costs in the projections have been lowered to a minimum and come short of what debtor's dairy cows feed intake should properly be.

44.    Debtor further seeks authorization to lease part of the unused milk quota of 58,700 liters for the price of approximately $2,000 bi-weekly at .10 cents per liter to further assist debtor in the reorganization effort and help finance the high operational costs and expenses, to purchase cattle to replace aging and non-producing stock with new stock to enable increase in milk production and feasibility to fund the Plan, and for the adequate protection payments, to Condado 5. The portion of the milk production to be leased is currently not being consumed and may be part of Condado 5's cash collateral, if the Court determines that the milk quota is in fact part of the cash collateral subject to Condado 5's UCC Financing Statement. The purported lessee is Milk Money Inc., through its President, Luis S. Martinez Rivera, PO Box 848, Hatillo 00659 with telephone at 787-210-4388.

### IV. Conclusion

WHEREFORE, movant respectfully requests an Order:

a)  determining that Milk Quotas are not cash collateral of any party;

b)  determining that Condado 5's UCC Financial Statements have lapsed and no longer subject to debtor's milk quota;

c)  in the alternative, debtor offers **$1,300** monthly to adequately protect Condado 5 for the use of its cash collateral;

d)  determining that Condado 5 who has an enforceable lien on the real property of third parties [debtor Juan M. Barreto Ginorio], is not entitled to adequate protection in periodic payments, since the real properties are not diminishing in value;

e)  in the alternative, debtor offers the same **$1,300** monthly to adequately protect Condado 5 from further diminishing value of the real estate that partially secures its

12

claim;

f)   allow debtor to lease part of its milk quota which at this time is not being consumed due to low milk production, at an estimated income from the lease of **$4,000**;

g)   allow debtor to supplement this motion with a proposed *Interim Order for Use of Cash Collateral* within 5  days;

h)    that the Order to be entered be effective *nunc pro tunc* to the filing of this case.

## NOTICE

Within fourteen (14) days after service as evidenced by the certification, and an additional three (3) days pursuant to Fed. R. Bank. P. 9006(f) if you were served by mail, any party against whom this paper has been served, or any other party to the action who objects to the relief sought herein, shall serve and file an objection or other appropriate response to this paper with the Clerk's office of the U.S. Bankruptcy Court for the District of Puerto Rico.  If no objection or other response is filed within the time allowed herein, the paper will be deemed unopposed and may be granted unless: (I) the requested relief is forbidden by law; (ii) the requested relief is against public policy; or (iii) in the opinion of the Court, the interest of justice requires otherwise.

CERTIFICATE of SERVICE: I certify that this motion has been filed electronically using Cm/Ecf and that a copy of the same has been caused to be noticed to José R. Carrion Morales, Esq, Chapter 12 Trustee at newecfmail@ch13-pr.com; and the known creditors Ferraiouli LLC for Condado 5 at s.colon@ferraiuoli.com and gchico@ferraiuoli.com and to Juan C. Fortuño Fas for USDA Farm Service Agency at bkfilings@fortuno-law.com; Edward W. Hill for ORIL at ehill@hillgonzalezlaw.com  and to the U.S. Trustee at ustpregion21.hr.ecf@usdoj.gov.

DATED: March 3, 2019.

s/ *L.A. Morales*
LYSSETTE A. MORALES VIDAL
USDC PR #120011

13

L. A. MORALES & ASSOCIATES P.S.C.
URB VILLA BLANCA
76 AQUAMARINA
CAGUAS, PUERTO RICO 00725-1908
TEL 787-746-2434 / 258-2658
FAX 855-298-2515
Email lamoraleslawoffice@gmail.com  &
irma.lamorales@gmail.com