IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:

VAQUERIA LAS MARTAS, INC.

    Debtor

CASE NO. 18-07304 (ESL)

CHAPTER 12

**OPINION AND ORDER**

The issue pending in this case is the determination by the court as to whether the milk produced by the cows owned by Vaquería Las Martas, Inc. (the "Debtor") and the income they generate are collateral to the lien held by the secured creditor Condado 5, LLC ("Condado"). Condado executed two security agreements to guarantee its loan. One under the Puerto Rico Uniform Commercial Code ("PR UCC"), 19 L.P.R.A. §§1221 et seq., and the other under the Milk Quota Act of Puerto Rico ("PR MQA"), 5 L.P.R.A. §1126 et seq. The issue is critical to the feasibility of the proposed, or any, Chapter 12 plan. The issue has history, past and current. The court will summarize the same to place the matter in perspective.

The Debtor filed the instant chapter 12 petition on December 14, 2018. This is the Debtor's second chapter 12 petition. The first was filed in 2011, case number 11-05237, which was substantively consolidated with case number 11-05236, filed by Juan M. Barreto Ginorio. The issue of the use of cash collateral claimed by Condado 5, LLC was before the court in these cases. Actually, a stipulation was filed by the consolidated debtors and Condado on October 27, 2017. The cases were dismissed on January 16, 2018 and closed on August 30, 2018.

The Debtor requested the consolidation of this case with case number 18-07310 filed by Juan M. Barreto. The request was opposed by Condado. The cases were administratively consolidated on April 8, 2019, after the Debtors' response indicating that they were requesting the administrative consolidation, although stating that substantive consolidation may be proper. On March 20, 2019 Condado filed a motion to dismiss, mainly due to Debtor's failure to file timely reports of operation. The Debtor opposed the motion to dismiss and an evidentiary hearing was scheduled for July 23, 2019. The court denied Condado's motion to dismiss at the hearing. See minutes of hearing (dkt. #87).

-1-

On November 26, 2019 secured creditor USDA Farm Services Agency ("USDA") filed a motion to lift the automatic stay. The debtor opposed the same. Condado also filed a reply to USDA's motion alleging that USDA has a junior lien ($12,509.56) subordinate to Condado's first lien ($1,626,362.59). The court, at USDA's request, continued the hearing on the motion to lift stay without a date pending a decision regarding whether Condado has a lien over the post-petition cash collateral.

The above sequence of events shows that the outcome of this case hinges on deciding the extent of Condado's lien. The court will list the motions filed in relation to this contested matter, summarize the positions of the parties in interest, and discuss the merits of the same to reach a decision.

### Procedural History of Contested Matter

On February 5, 2019 Condado filed a motion to prohibit the Debtor from using its cash collateral. An Interim Order prohibiting the use of cash collateral was entered on February 11, 2019. The Interim Order also scheduled a hearing for March 5, 2019 to consider the matter, if contested. After the order was entered Debtor filed an opposition to the motion to prohibit use of cash collateral and Condado responded to the same. On March 4, 2019 the Debtor filed a motion for authorization to use Condado's cash collateral. The motions were considered at the March 5, 2019 hearing, wherein the court questioned the extent of Condado's lien and acknowledged there was a valid lien over the milk quota. The court noted that at the time all milk quota production was being paid to Condado. The court ordered the parties to file legal memoranda on the extent of Condado's lien as to the cash collateral.

Condado filed its opposition to Debtor's motion for use of cash collateral, the Debtor replied to the same, the Chapter 12 trustee submitted briefs on the issue, and Condado filed its opposition to the Chapter 12 trustee's briefs. The matter was scheduled for a hearing, which was held on July 23, 2019. The minutes of the hearing (dkt. #88) show the following:

> "The key issue in this case is whether the milk produced by debtor's cows and the income it generates is collateral to the Condado 5 loan. Condado's loan was secured by two agreements one under the PR UCC, 29 LPRA, which expired in 2015; and under the Milk Quota Act of P.R., 5 LPRA. The court finds that Condado has a lien over the milk quota. However, the court is concerned whether the milk produced by the cows is also subject to the lien. Condado argues that the milk is proceeds from the milk quota and is subject of Condado's lien under section IV par. 3 and VII par. 5 of the security agreement. The Chapter 12 Trustee argues that cows

are not included as collateral to Condado's lien, that cows produce the milk, that a quota does not produce milk and that milk is sold it generates an account receivable. The Chapter 12 Trustee also informed that he now disagrees with the P.R. Courts now binding precedent and will file a supplemental brief. The court also arises concern regarding whether ORIL is a party in interest to this controversy. In view of the foregoing, the court orders the Chapter 12 Trustee to file an amended brief within 7 days, Condado shall reply within 7 days, and ORIL to state its position 21 days thereafter."

On July 29, 2019 the Chapter 12 trustee filed his amended legal brief questioning Condado's lien over the milk produced by the cows, and Condado replied to the Chapter 12 trustee's brief on August 19, 2019. The Puerto Rico Milk Industry Regulatory Office ("ORIL") filed its position on August 20, 2019, also questioning Condado's lien over the post-petition production of milk pursuant to 11 U.S.C. §552. Condado filed its reply to ORIL's position on August 30, 2019. Upon this court's order of December 11, 2019 continuing the hearing on USDA's motion to lift stay, the matter was deemed submitted to the court.

## POSITION OF THE PARTIES

### Chapter 12 Trustee

Vaquería Las Martas, Inc., is a dairy farm corporation duly licensed to operate and owns a raw milk production quota that authorizes the corporation to produce fresh milk in the amount of 58,700 liters every 14 days. In order to solve Condado's request regarding cash collateral the court must first answer the "critical issue" whether as of the petition date Condado had a perfected security interest over debtor's assigned Milk Quota (58,700 liters of raw milk produced every 14 days) and over the Account Receivables that result from the sale transactions of raw milk with the milk processing entity, in this case Suiza Dairy. "This determination requires an examination of facts, in light of these statutes, 5 L.P.R.A. §§1126 et seq.—Registry of Quotas Transactions ("RQT") [PR MQA] of the Oficina de Reglamentación de la Industria Lechera and 19 L.P.R.A. §§1221 et seq.—Puerto Rico Uniform Commercial Code ("PR UCC")."

The secured interest of Condado must be determined by applicable non-bankruptcy law, that is, Puerto Rico law. Butner v. U.S., 436 US 955,98 (1978). "The Governmental Agency entrusted with the enforcement of the RQT [PR MQA] is the Oficina de Reglamentación de la Industria Lechera ("ORIL")." It is ORIL's duty to be the custodian of the Registry of Quota

Transactions (RQT) [PR MQA]. See.5 L.P.R.A. §§1127). The Chapter 12 trustee's position is that Condado did not have as of petition date a perfected security interest over the Milk Quota or the Account Receivables of Suiza Dairy.

Condado filed a proof of claim in the secured amount of $1,626,362.59 (POC No. 6-1). The secured claim is based on a January 12, 2005 loan that is secured by different collaterals such as real properties, contracts, account receivables and milk production quotas. Agricultural products as defined by the UCC and the milk producing cows were not contemplated as collaterals. "Among the account receivables considered were those related to the raw milk sales transactions with Suiza Dairy, with priority for $7,450 every 14 days. [See. Acuerdo de Gravamen Mobiliario POC6-1 at page 25, "B. Contratos de Colateral", ¶2., see also page 146, "Colateral Y Clausulas", Part "Quinto", ¶1., see also UCC-1 No.2005006313 at page 156, recorded on January 21, 2005]."

On January 21, 2005, Banco Popular de Puerto Rico filed a Financing Statement for both, the milk production quota and the account receivables, with the PR State Department under the PR UCC to perfect a lien over the assets given as collateral. Banco Popular de Puerto Rico also registered a lien over the milk production quota in the Registry of Quotas Transactions at ORIL under the RQT[PR MQA].

Condado has an unperfected security interest over debtor's Milk Quota because the Financing Statement (UCC-1 No. 2005006312) originally filed with the PR State Department and perfected under UCC §2260(a) expired on January 21st, 2015 by operation of the provision in §2335(a). "When the UCC-1 was filed, § 2335(a) provided that the perfected lien expired and ceased to be effective 10 years after its recording. No extension was requested under §2335(d). Hence, as of the petition date, this security agreement was unperfected."

Condado also claims to have a perfected security interest under the 5 L.P.R.A. §1135. Condado relies on the interpretation of 5 L.P.R.A. §1135(a) made by the Puerto Rico Court of Appeals in PR Asset Portfolio 2013-1 Intern., LLC v. Tropical Heifers, Inc., 2017 WL 2462052 (2017). The Chapter 12 trustee argues that the Tropical Heifers interpretation of RQT §1135 should not be followed. The Chapter 12 trustee argues that although as of the petition date "the Registry of Quotas Transactions of ORIL reflected that Condado had a first rank lien over Vaquería Las Martas, Inc.'s entire milk production quota, such lien is ineffective and unperfected, as it fails to comply with requirements of perfection under the RQT[PR MQA] §1135."

The Chapter 12 trustee lays the foundation for his argument with the definitions in the Milk Quota Act.

> A License is defined as "The permit issued to milk producers by the Administrator for the operation of dairies." See 5 LPRA § 1126(f). A Milk Producer is defined as "Any person who is owner, administrator or in charge of dairies." See 5 LPRA § 1126(h). The term Total Quota is defined as "The amount of quarts of milk that the Office of the Milk Industry Regulation Administrator assigns to milk producers, to be produced every fourteen (14) days, in accordance with the market's needs." See 5 LPRA §1126(c). This law also defines the term Transaction as "The sale, lease or bequest of the producer quota." See 5 LPRA § 1126(i).

The rights and limitations of a licensed farmer to sell milk based on a quota allowed by ORIL is described as follows:

> Relates to point out that a license under the statute is issued to a milk producer to operate a dairy farm. That license authorizes the milk producer to sell raw milk produced into the fresh milk market. The total quota assigned by ORIL fixes the amount of milk that can be produced by the milk producer for the fresh milk market. Hence, the milk quota assignment is not a license to sell raw milk, is a production limit, a predetermined share of the fresh milk market. Since RQT allows and regulates transactions of milk quotas assigned by ORIL to milk producers, the milk quotas are an asset which value is determined by private quota sales transactions between licensed milk producers or by ORIL auctions among licensed milk producers. The license to operate a dairy farm and to sell raw milk in the fresh milk market of Puerto Rico is not an asset subject to be sold, rented or used as collateral. The quota, as an asset, is subject to transactions regulated by RQT, which includes its sale, its rent, or its use as collateral for credit. For example, if a dairy farmer's license is revoked, he could no longer be able to sell raw milk into the fresh milk market but would remain the owner of the assigned quota until it is privately sold or auctioned by ORIL among licensed milk producers.

The requirements to perfect a security agreement over the Total Quota of milk production, as the term is defined in 5 LPRA § 1126(c), is determined by § 1135. Liens recorded in the registry constitute an encumbrance upon quotas provided said liens were constituted or recorded in compliance with § § 1221 et seq. of Title 19.

Statutory "construction starts with the plain-meaning rule which provides that if the text of a statute is unambiguous, it should be applied by its term without recourse to policy arguments, legislative history, or any other extraneous to the text —unless this application leads to an

absurdity." The plain reading of the second sentence of 5 LPRA § 1135(a) is that liens must be recorded "in this registry," the Registry of Quota Transactions at ORIL, and must be constituted or recorded in compliance with the perfection requirements of the PR UCC. "The clear meaning of this statute mandates, as a precondition to a valid and effective perfection of a lien recorded at the Registry of Quota Transactions at ORIL, over milk quotas, the compliance with the requirements for the perfection of a security agreement in the Registry of Commercial Transactions at the State Department under the PR UCC § 2260(a). It follows that, since the validity and effectiveness of the perfection under RQT [PR MQA] is dependent to the UCC, if the perfection is no longer valid and effective under the UCC, then the perfection is no longer valid and effective under the RQT [PR MQA]."

The appellate court of San Juan in the case of PR Asset Portfolio 2013-1 Intern., LLC v. Tropical Heifers, Inc., concluded that under 5 L.P.R.A. § 1135(a), recording the lien only with ORIL in the Registry of Quota Transactions is sufficient to perfect a lien over the milk quotas and that its recording in the Registry of Commercial Transactions at the State Department under the PR UCC § 2260(a) was unnecessary. "The court reasoned that the use of the disjunctive conjunction "o" in Spanish, i.e. "or" in the English translation, in the statute, between the words constituted and recorded, implied that there is an option for recording the lien either in the Registry of Quota Transactions at ORIL under RQT [PR MQA] or under the PR UCC in the Registry of Commercial Transactions at the State Department. This interpretation is absurd and does not follow the plain meaning of the statute. It is an interpretation that renders the statute's condition of perfection to the compliance with the UCC superfluous and unnecessary. As such, this interpretation fails to follow one fundamental canon of statute interpretation, i.e. the Surplusage Canon, which provides that —If possible, every word and every provision is to be given effect...None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence**."** The Chapter 12 trustee alleges that the court "in Tropical Heifers ignores the statute's mandatory condition for the perfection of the recording made at the Registry of Quota Transactions at ORIL, of the additional compliance with the PR UCC. The disjunctive conjunction "or" is between the words constituted and recorded in the statute referring to the PR UCC requirements, not referring to the sentence subject, that is, the liens already recorded at the Registry of Quota Transactions at ORIL.

The Chapter 12 trustee argues that:

". . . it is evident that in the context of the statute, the word constituted means perfection of a lien under the UCC and the word recorded also means the perfection of a lien under UCC. A lien under the UCC is constituted by the recording of a financing statement (UCC-1 form) in the Registry of Commercial Transactions at the State Department, therefore, its recording, makes effective and constitute[s] the perfection of the lien under the UCC. Accordingly, the terms as they refer to the additional condition of compliance with the perfection requirements under the UCC, are in fact interchangeable. Furthermore, the disjunctive conjunction "or" is between the words constituted and recorded which are located after the words provided said liens, again referring to the sentence subject, defining the additional condition of compliance with the UCC perfection requirements, before a lien recorded at the Registry of Quota Transactions at ORIL could be effective, perfected. Hence, compliance with the UCC is a mandatory condition under the statute to perfect a lien recorded at the Registry of Quota Transactions at ORIL. The plain reading of the statute does not provide a lien perfection option between recording the lien at ORIL or compliance with the UCC. Accordingly, since effectiveness of the perfected lien under RQT [PR MQA] is dependent to the perfection requirements under the UCC, then when the lien perfection expired under the UCC, the effectiveness of the perfection under RQT [PR MQA] also expired. In consequence Condado, had an unperfected security interest over the milk quota when the petition was filed on December 14, 2018. Condado has an unperfected security interest over debtor's account receivables. Condado also claims having a perfected security interest, under 5 L.P.R.A. § 1135(a), over the account receivables related to the proceeds of the sales of raw milk to Suiza Dairy processing Plant every 14 days. The Financing Statement (UCC-1 No.2005006313) originally filed with the PR State Department and perfected under UCC§ 2260(a), expired on January 21st, 2015, by operation of UCC§2335(a). As explained before, when the UCC-1 was filed, § 2335(a) provided that the perfected lien expired and ceased to be effective10 years after its recording. No extension was requested under § 2335(d). Unlike the milk quotas, there is no provision in 5 L.P.R.A. §§1126 et seq. to perfect liens over account receivables. It only provides for the perfection of liens over milk production quotas. Notwithstanding that the sale of raw milk is a commercial transaction, it is not a transaction regulated by RQT [PR MQA]. RQT [PR MQA] deals with milk production quotas and all its related transactions, i.e. as defined by §1126(i), i.e. the sales, rental or perfection of liens over milk production quotas. The contemplated security interest perfected under this law is limited to only the assigned milk production quota. Other transactions, like acquiring milking equipment, buying or renting milking facilities, buying, selling or renting livestock, or the commercial transactions of selling raw milk to Suiza Dairy, which create account receivables for the milk producer, are not transactions regulated by RQT [PR MQA]. [See the definition of the term transaction in 5 LPRA§ 1126(i).]

Condado, when the petition was filed, did not have a perfected security interest over the account receivables that resulted from the sale of raw milk every 14 days to Suiza Dairy. Having an unperfected lien recorded in the Registry of Quota Transactions at ORIL over debtor's milk production quotas does not change that fact. Condado, neither can claim that its security interest attaches to any identifiable proceeds of a collateral, as it could have claimed under PR UCC 19 LPRA §2265(2), and since there is no similar provision in 5 L.P.R.A. §§ 1126 et seq., it cannot claim that the post-petition production of raw milk is a product generated by the collateral (the milk quota), nor it can claim that the account receivables resulting from the sale of the milk are proceeds or rents from the collateral. Also, as explained before, the assigned milk quota, as it is defined by the statute, is not a license to sell raw milk. Therefore, the sales of raw milk also cannot be construed as products of the assigned milk quota. In any case, the sales of raw milk are product of the license which is not subject to a lien. Post-Petition Account Receivables are Free of any Perfected Lien related to Prepetition Security Agreements as a general rule, under 11 USC § 552(a), property acquired post-petition is not subject to any lien resulting from a security agreement entered into by the debtor before the commencement of the case. The exceptions are described in its subsection (b). The facts in this case show that under 11 USC § 552(a), the post-petition production of raw milk every 14 days, under the assigned milk production quota to a licensed milk producer (the debtor), is post-petition acquired property free from any lien. Condado fails to demonstrate that the security agreement entered into with the debtor pre-petition conforms with any of the exceptions of §552(b). In In re Nat'l Promoters & Servs, Inc., 499 B.R.192, 207, 2013 WL 4829162 (Bankr. D.P.R. 2013), the court cited In re Cafeteria Operators, L.P., 299 B.R. 400, 405 (Bankr.N.D.Tex.2003): "For a pre-petition security agreement to attach to after-acquired property, a creditor must show the following: (1) the security agreement extends to the after-acquired property upon which the creditor seeks the lien, and (2) the after-acquired property is proceeds, product, offspring, rents, or profits of pre-petition property subject to the lien... The express terms of the security agreement generally govern the first prong, while state law generally governs the second prong." Emphasis added. Notwithstanding that Condado pre-petition security agreement extends to account receivables resulting from the sales of raw milk to Suiza Dairy, as it has been demonstrated, there is no perfected lien over the account receivables neither under RTQ [PR MQA] or UCC. Therefore, under §544(a)(1)'s "strong arm clause" the debtor, as debtor in possession is a "lien creditor" and has a senior priority interest over Condado's interest in both the milk production quota and the account receivables of Suiza Dairy."

The Chapter 12 trustee concludes that:

The perfected security interest that Condado once had over the milk quota and over the account receivables, under the PR UCC, expired pre-petition on January 2015, by operation of 19 LPRA§2335(a). Since the effectiveness of the lien under RQT [PR MQA] depends of the effectiveness of the lien under UCC, the expiration of the lien under UCC also ceased the effectiveness of the lien under RQT [PR MQA]. A lien that does not exist pre-petition cannot be extended to post-petition acquired property.[§552(a)] Even applying the incorrect decision in case of PR Asset Portfolio 2013-1 Intern., LLC v. Tropical Heifers, Inc., supra., it limited its determination to the perfection of the security interest over the milk production quota in ORIL under RQT [PR MQA], not to the perfection of security agreement over account receivables from proceeds from sales of raw milk to Suiza Dairy, which are not regulated by RQT [PR MQA]. At best, Condado could claim having a valid security agreement with the debtor that because it was not perfected pre-petition, no lien existed when the petition was filed over those assets. Accordingly, under § 544(a)(1)'s "strong arm clause" the debtor, as debtor in possession it is a "lien creditor" and has a senior priority interest over Condado's interest in both the milk production quota and the account receivables of Suiza Dairy. Finally, for the reasons above described, Condado has an unperfected security interest over both, the debtor's assigned milk quota and over the raw milk proceeds from its sales (account receivables). Inasmuch as there is no cash collateral, the debtor is not required to seek authorization under § 363(a) to use something that does not exist, and for the same reasons, Condado does not have a right to request the prohibition of its use.

In summary, the Chapter 12 trustee prays this court to deny Condado 5, LLC's, "Motion to Prohibit the Use of Cash Collateral."

**Puerto Rico Milk Industry Regulatory Office (ORIL)**

ORIL acknowledges that there is no clear precedent in reference to the question posed by the court and prompting its reply, and that there is split on decisions. ORIL submits that the plain-text interpretation of Section 552(b) is preferred within the First Circuit. Section 552(b) of the Bankruptcy Code provides for three conditions that must be present in order for the milk produced by Debtor to be subject to the Condado 5's lien.

ORIL states that the court has already determined that Condado 5's loan is secured by two agreements, one under the PR UCC, 29 L.P.R.A., which expired in 2015, and under the Milk Quota Act of PR, 5 L.P.R.A. Thus, the first condition in Section 552(b) is met, that is, the parties entered into a security agreement before the commencement of the case. The issue hinges on the other two.

The second condition to be met is whether the security agreement by its terms extends to the debtor's pre-petition property and to proceeds, product, offspring, of such property. ORIL states that in this case, the second condition is absent.

"The terms of security agreements do not extend to the "product" of pre-petition property, since dairy cows do not specifically serve as collateral, nor to the milk produced by the dairy farm.  According to the Loan Agreement, "Debtor's obligations under this Contract, the Note and the other Loan Documents shall be guaranteed by the Collateral that is listed in "Exhibit A."  Dkt. #17-1, p. 6 (Exhibit 1-Loan Agreement) (Our Translation).    Exhibit A, which is a boilerplate document, marks with and "X" the items that shall serve as collateral.   Dkt. #17-1, p. 23.   These  are:(a) Real Properties that are "described in the mortgages," (b) Contracts "that are in vigor at the Date of the Closing or that may be entered by the Debtor in the future," and (c) Accounts that "exist or that in the future may be acquired by the Debtor...that constitute a right to receive a payment in money."  Id. (Our translation).  Inventory, Products, nor Agricultural Products are marked with an "X". Dkt. #17-1, p. 20-21.  In order to meet the second condition, specificity is determinative.  See InRe Veblen W. Dairy, LLP, 2010 Bankr. LEXIS 2231, *7 (Bankr. D. S.D. 2010) (Creditor's "security interests extend to property acquired by Debtor prior to the petition date and to the proceeds including those from the sale of milk —and products —including milk—of that property. Consequently, pursuant to §552(b)(1), and notwithstanding §552(a),  AgStar's security interests extend to any and all proceeds of its collateral —including those from the sale of milk —and products of its collateral —including milk —acquired by the estate on  or  after the petition date."), In Re Wiegmann, 95 B.R. at 91 (The "security for this debt" specifically included "all products of livestock and/or poultry given  as  collateral  hereunder,  including  all eggs, milk and wool produced therefrom...") (underline added); Smith v. Dairymen, Inc., 790 F. 2d at 1112 ("We think that the conditions of subsection (b) have been met [since] the FHA had a pre-petition security agreement which expressly created a lien on the milk produced on  the debtor's farm.") (underline added); In Re Potter, 46 B.R. 536 (Bankr. E.D. Tenn. 1985) ("[T]he security agreements entered ...create a security interest in...[a]ll livestock...other farm products and  supplies  now  owned  or  hereinafter acquired  by  the  Debtor,  together  with  all increases...[m]ilk is thus a 'farm product' and the milk from debtor's cows was covered by the security interest.") (underline added).  Since the security agreements in this case do not specify, express or cover that milk is included under product or agricultural product, then the milk produced after the petition is not subject to the security agreements, and as such 552(b)'s second condition cannot be met."

The third condition to be met is whether state law permits a security interest on such property. "The Puerto Rico Civil Code allows livestock property (dairy cows) and consumable or fungible property (milk) to serve as a guarantee or collateral for a loan. However, the milk industry regulations only permit licensed farmers to market milk. Thus, encumbering or collateralizing the actual milk produced by a dairy farmer's dairy herd would be contrary to Puerto Rico law." ORIL concludes that the third condition to meet Section 552(b)'s exception is not present based on Puerto Rico laws and regulations.

The Puerto Rico Civil Code provides for two basic guarantee contracts for obligations (P.R. Laws Ann., tit. 31, Sec. 5001), the pledge, which is a security agreement over personal property (bien mueble) (P.R. Laws Ann., tit. 31, Secs. 5021-5031), and the mortgage, which is a security agreement over real property or real property rights (P.R. Laws. Ann., tit. 31, Secs. 5041-5048).

"The Civil Code defines personal property (bien mueble) as property susceptible to possession and to transportation from one point to another. P.R. Laws Ann., tit. 31, Sec. 1061. One kind of personal property is fungible or consumable, which is anything that in order to adequately use must be consumed. P.R. Laws Ann., tit. 31, Sec. 10666. Fungible or consumable personal properties may be attached by a creditor, caused to be sold in public auction and its product deposited in court. See Puerto Rico Rules of Civil Procedure, 56.4. Act 34 defines fresh milk as milk in its natural state that is pasteurized and homogenized to be sold to the public for consumption; fluid milk as milk in liquid form sold to the public in differing formulations or categories for consumption by the public; and UHT milk as a form of processing that is sold to consumers for consumption. See P.R. Laws Ann., tit. 5 Sec. 1092(h), (l) and (m), tit. 5, Sec. 1126(e). Milk industry regulations such as those contained in the Code of Federal Regulation (CFR), the Pasteurized Milk Ordinance (PMO) and Regulation 88897 and Regulation 86618 (for example) provide further definitions of milk in its different forms, ingredients, formulations and categories. Milk is therefore a type of fungible personal property (bien mueble fungible)."

ORIL states that in Puerto Rico, milk

"is a highly regulated commodity, not in ordinary commerce as other consumable personal properties are. Milk is regulated from farm to table-its production, transportation, processing, distribution and sale are all regulated. In Puerto Rico, only licensed dairy farmers may market raw milk, and own or possess and/or transact with milk production quota. P.R. Laws Ann., tit. 5, Sec. 1126(c) and (h), Regulation 8660 of November 12, 2015, Section 5." Dairy farmers

-11-

"produce raw milk based on their participation within the total production quota issued in a fourteen-day liquidation or settlement period known as a quincena, or a "fortnight." P.R. Laws Ann., tit. 5, Sec. 1126(b). The processing plants pick up the milk production from the farms and generate a milk receipt that is delivered to the farmers and informed to ORIL. The raw milk from several individual farms is deposited in plant-owned refrigerated tankers and transported to the processing plant for processing to different products. Although the Administrator assigns farmers to processing plants, farmers and processing plants enter into supply contracts. That means that the raw milk is consigned to the plant to whom the farmer is assigned in order for the processing plant to meet its fresh milk demand, and in the event of it being considered as surplus, to whom the Administrator assigns it. The processing plants, pursuant to regulatory priority, determine the use they will give to the raw milk pursuant to regulatory priority (meeting fresh demand, then for other products) and inform it to ORIL. See generally Regulation 8657 of November 12, 2015, Section 8. Processing plants have different uses for the raw milk, different market demands for their products and determine different volumes of surplus raw milk, which is also turned into consumable products. Processing plants have different uses for the raw milk, different market demands for their products and determine different volumes of surplus raw milk, which is also turned into consumable products. Similar to what occurs under milk marketing orders in the United States, milk pooling and blended prices in Puerto Rico are the norm for farmer compensation. Milk receipts are often pledged or assigned by farmers as an account receivable. ORIL is not aware of a situation where the raw milk itself has been pledged or assigned to a creditor. Pledging or assigning the raw milk itself, however, would disrupt the system summarized above, and the business of the dairy farmer and the plants, as well as being impractical."

ORIL provides the following example to illustrate the technical and the practical aspects of its position:

"Assuming that a creditor could obtain pre-petition a security interest over raw milk and/or could attach the raw milk upon a debtor's default, there are practical and equitable considerations that warrant against permitting a security interest to extend it to milk produced post-petition. A creditor would have to be careful not to attach the raw milk tanker that belongs to a processing plant, nor attach the milk when it is mixed together with milk belonging to other farmers. Further, the creditor needs to know when to attach the raw milk because it would become worthless by the passage of time. Raw milk cannot be more than 48 hours old when it is picked up by the processing plant. Regulation 8889, Section 8(C)(1). Raw milk older than 48 hours must be discarded. More importantly, a creditor that obtains possession over any amount of raw milk could never market such milk

within the milk industry because creditors are not licensed producers or operators of a business within the milk industry. Regulation 8889, Section 5 and Section 9, Regulation 8657, Section 5. Thus, the post-petition property would be worthless to a creditor. A creditor could, arguendo, hold a public bid for sale of the attached milk outside of the milk industry, perhaps with cheese factory participants, but the creditor would have to arrange transportation and would sell that raw milk at a lower price for such a perishable item. Clearly, there are less slippery prey for a creditor to chase."

ORIL concludes that:

"Bankruptcy authorities are split as to the manner in which Section 552 is interpreted. Some authorities cited herein stand for the proposition that "milk produced post-petition is an asset coming into existence totally after the filing and not intended to be covered by the 552(b) exception." If the Court decides to apply the intent interpretation for Section 552(b) in this case, then the milk produced by Debtor's dairy farm is not subject to the 552 exception. Other authorities require that the creditor meet the three conditions of Section 552(b). If the Court decides to apply the plain-text interpretation here, then at least one of the conditions to its application is absent, because the security agreement does not specify that the dairy cows or the raw milk produced by Debtor's dairy farm operation serve as collateral to the loans. But, regardless of how the Honorable Court decides to interpret Section 552(b), whether under its intent, or under its plain-text, Puerto Rico law and regulations would not permit the raw milk produced by the Debtor's dairy farm to serve as collateral for the loans, existing also practical and equitable factors that militate against extending a security interest over the raw milk produced by Debtor's farm."

ORIL requests the court to hold that the raw milk produced by Debtor's dairy farm operation cannot or should not serve as collateral for Condado 5's loans.

### Condado 5, LLC

Condado replied to the Chapter 12 trustee's brief asserting that it is a secured creditor holding a valid lien over Debtor's milk quota, that is, "Debtor's production of 58,700 liters of milk every 14 days and that such security interest is currently registered with ORIL in favor of Condado."

Condado first sets basis by citing Article 11(a) of the Registry of the Milk Industry Production Quota Transactions Registry Act of 2000, as amended, which reads as follows: "Liens upon quotas subject them, directly and immediately to compliance with the obligation for the security of which they were constituted. Liens recorded in this registry shall constitute an effective

-13-

encumbrance upon quotas, provided said liens were constituted or recorded in additional compliance with §§ 1221 et seq. of Title 19, which pertains to guaranteed transactions." 5 L.P.R.A. § 1135(a) (emphasis and underline added, Lexis translation 2019). Condado emphasizes the inclusion of the disjunctive "or" in the statute to counter the Chapter 12 trustee's "invitation" for "the Court to rewrite via judicial construction Article 11(a) of the Registry of the Milk Industry Production Quota Transactions Registry Act, supra, disregard the disjunction "or" therein and substitute it instead with the conjunction "and". That is, the Trustee moves the Court to interpret that the validity and effectiveness of the perfection of the lien over the quota with ORIL is additionally dependent on the second provision in the statute, i.e., prior compliance with a UCC under the PR Commercial Transaction Act. This, according to the Trustee, is the 'plain meaning of this statute'."

This same issue was presented to the PR Court of First Instance, Superior Court in PR Asset Portfolio 2013-1 International LLC v. Tropical Heifers, Inc., 2017 PR App. LEXIS 1294, 2017 WL 2462052. The PR Court of Appeals considered the same arguments raised by the Trustee in his Amended Brief. But the PR Court of Appeals, like the PR Court of First Instance, emphasized Legislator's use of the disjunctive "or" and followed the applicable legal standard for such disjunction." The PR Court of Appeals concluded that the registration of the lien with either forum suffices to create a security interest over the milk quota. Condado admits that the opinions "issued by the PR Court of Appeals are not binding, they are certainly persuasive. See Art. 4.005 of the PR Judiciary Act, 4 L.P.R.A. § 24x."

Condado argues that:

"Just because Condado may not have UCC lien over all of the Debtor's accounts receivables does not mean that the production from the milk quotas is not encumbered. Without a UCC lien over the Debtor's accounts receivables, the Debtor may sell milk outside and beyond the milk quota lien and such proceeds would not be encumbered by Condado. In other words, the accounts receivable lien would encumber all accounts receivables, be them through the milk quota production or otherwise. The lien over the milk quota means that when the Debtor produces milk every 14 days, such production therefrom is encumbered through the quota. That is why Puerto Rico law distinguishes between registration with ORIL versus the UCC financial statement registration of accounts receivables. Otherwise, the recurring lien over the milk quota every 14 days becomes an absurdity."

Condado also replied to ORIL's position. At the outset, Condado states that "ORIL does not cite or address the consequences of Condado's current lien over the milk quotas as it appears from its own records (Docket No. 17-3, p. 3, § IV(1); Docket No. 43-1). Neither does it mention or discuss the consequences and applicability of the ratio decidendi by the PR Court of Appeals and the PR Court of First Instance in PR Asset Portfolio 2013-1 International LLC v. Tropical Heifers, Inc., 2017 PR App. LEXIS 1294, 2017WL 2462052 (P.R. Ct. of Appeals 2017). Condado points out "that the milk quota system and the creation of liens thereover is only available in Puerto Rico under local law. In other jurisdictions within the US, milk quotas do not exist and thus cannot be encumbered."

Condado explains that "milk quotas are still available in Puerto Rico through the PR Registry of Transactions of Production Quotas of the Milk Industry Act, PR Act No. 301 of September 2, 2000, 5 L.P.R.A. §§ 1126 et seq. (the "PR Milk Quota Act"), and there are three available methods to create a lien over them: (a) a UCC financial statement over a debtors' accounts receivables; (b) a lien over the cows and extensively, over the milk they produce; and/or (c) a lien over the milk quota with ORIL.  Each lien is different, serves a different purpose and has a different reach." First, a UCC lien over a debtor's accounts receivables would mean a lien over any and all financial monies the debtor would be entitled to receive, be them from milk production, collection of monies, the sale of non-dairy products and/or otherwise. Second, a lien over the debtor's cows extends to the cow's milk and "would further encumber proceeds from any milk and/or milk product that the farmer sells, be it to through the milk quota processing plant, a glass of milk and/or cheese, inter alia, to anybody, that is, to the milk processing plant and/or his next-door neighbor. Third, "there is the lien registered over a debtor's milk quota. This lien only encumbers sale of the production through the milk processing plants every 14 days up to amount thereby allowed."

Condado admits that it does not have a pre-petition lien over the Debtor's accounts receivables or cows, but asserts to "have a pre-petition lien over the milk quota that was registered in accordance with Puerto Rico law as interpreted by the PR Court of First Instance and the PR Court of Appeal in PR Asset Portfolio 2013-1 International LLC v. Tropical Heifers, Inc."

**Discussion**

The legal issue before the court is challenging and of critical importance to the milk industry in Puerto Rico.  The parties have all filed excellent legal memoranda on the issue as to

-15-

whether the milk produced by the cows owned by the Debtor and the income they generate are collateral to the lien held by the secured creditor Condado. A thorough analysis of the parties' positions, particularly the admissions as to what may not be contested, leads the court to conclude that the outcome, under the particular circumstances of this case, may not be as complex as originally envisaged.

Vaquería Las Martas, Inc., is a dairy farm corporation duly licensed to operate and owns a raw milk production quota that authorizes the corporation to produce fresh milk in the amount of 58,700 liters every 14 days. The "critical issue" is whether Condado had a perfected security interest as of the petition date over debtor's assigned Milk Quota and over the Account Receivables that result from the sale transactions of raw milk. The court must decide the issue according to Puerto Rico law, that is, 5 L.P.R.A. §§1126 et seq.—Registry of Quotas Transactions ("RQT") [PR MQA] of the Oficina de Reglamentación de la Industria Lechera and 19 L.P.R.A. §§1221 et seq.—PR UCC.

Secured creditor Condado admits that it does not have a pre-petition lien over the Debtor's accounts receivables or cows but asserts to have a pre-petition lien over the milk quota based on Puerto Rico law and on the decision in PR Asset Portfolio 2013-1 International LLC v. Tropical Heifers, Inc. The court has found that Condado has a valid lien over the milk quota since the inception of the contested matter. The issue is whether the lien over the milk quota extends to the milk produced by the cows.

The security agreement does not specify that the dairy cows or the raw milk produced by Debtor's dairy farm operation serve as collateral to the loans. The milk is produced by the cows. The court agrees with the Chapter 12 trustee that the milk quota assigned by ORIL is the amount of milk that can be produced by the milk producer for the fresh milk market. The milk quota is a production limit. A milk quota is an asset and the value is determined by market conditions under ORIL regulations. Milk quotas do not produce milk. Since Condado's collateral does not include the cows, it may not claim that its security interest attaches to any identifiable proceeds of the cows.

Upon the above conclusion, the court need not delve on the soundness of the Puerto Rico decision in PR Asset Portfolio 2013-1 International LLC v. Tropical Heifers, Inc., nor the appropriateness of allowing that milk produced by cows be subject to a lien because of its perishable nature, how it is processed, and the applicable Puerto Rico milk quota regulations.

-16-

## CONCLUSION

In view of the foregoing, the court concludes that the milk produced by Debtor's cows is not subject to Condado's collateral.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 15th day of April 2020.

Enrique S. Lamoutte
United States Bankruptcy Judge

-17-