**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE:<br><br>VAQUERÍA LAS MARTAS, INC.<br><br>      Debtor | CASE NO. 18-07304 (ESL)<br><br>CHAPTER 12 |

**MOTION FOR STAY PENDING APPEAL**
(Related Docket Nos. 120, 147, 149)

TO THE HONORABLE COURT:

    COMES NOW Condado 5, LLC ("Condado"), through its undersigned counsel, and respectfully states and prays as follows:

Procedural Background

    1.    On or around January 12, 2005, Banco Popular de Puerto Rico ("BPPR"), predecessor in interest of Condado, extended to the Debtor a credit facility in the amount of $1,850,000.00 (the "Loan"). See the *Louan Agreement*, Proof of Claim No. 6, pp. 5-27; Docket No. 17-1.

    2.    Such Loan was due on January 12, 2010, but BPPR granted a moratorium that extended such due date until January 12, 2015. See Proof of Claim No. 6, pp. 6, 47.

    3.    The Loan is secured, *inter alia*, by 58,700 quarts of Debtor's bi-weekly milk quota. See *Security Agreement* executed on January 12, 2005 authenticated through affidavit no. 28,485 before Notary Public Francisco J. Arraiza Donate. The *Security Agreement* was duly registered at the Oficina de Reglamentación de la Industria Lechera in compliance with the PR Registry of the Milk Industry Production Quota Transactions Registry Act of 2000, as amended, 5 L.P.R.A. §§ 1126 *et seq.* See Proof of Claim No. 6, pp. 132-143; Docket No. 17-3, pp. 1-12. Also see Certification issued by the Departamento de Agricultura de Puerto Rico, Oficina de Reglamentación de la Industria Lechera ("ORIL") demonstrating that Condado has duly registered liens therewith, Docket No 43-1.

4. On December 14, 2018, the Debtor filed a voluntary Chapter 12 bankruptcy case. See Docket No. 1.

5. On February 19, 2019, Condado filed Proof of Claim No. 6 in the secured amount of $1,626,362.59. See Proof of Claim No. 6. Such Proof of Claim is deemed allowed under 11 U.S.C. § 502(a).

6. On April 15, 2020, after various procedural events, the Court issued an *Opinion and Order* (Docket No. 120), 2020 Bankr. LEXIS 1020, 2020 WL 1888951 (Bankr. D.P.R. 2020), stating as follows:

> **The court has found that Condado has a valid lien over the milk quota since the inception of the contested matter**. The issue is whether the lien over the milk quota extends to the milk produced by the cows.
>
> The security agreement does not specify that the dairy cows or the raw milk produced by Debtor's dairy farm operation serve as collateral to the loans. The milk is produced by the cows. The court agrees with the Chapter 12 trustee that the milk quota assigned by ORIL is the amount of milk that can be produced by the milk producer for the fresh milk market. The milk quota is a production limit. A milk quota is an asset and the value is determined by market conditions under ORIL regulations. Milk quotas do not produce milk. **Since Condado's collateral does not include the cows, it may not claim that its security interest attaches to any identifiable proceeds of the cows.**
> …
> In view of the foregoing, **the court concludes that the milk produced by Debtor's cows is not subject to Condado's collateral.**

Id. at pp. 16-17, lines 12-2 (emphasis added).

7. On April 29, 2020, Condado filed a *Motion for Reconsideration* of the *Opinion and Order* (Docket No. 123), which was denied. See *Order Denying Motion for Reconsideration*, Docket No. 147.

8. Condado and the Chapter 12 Standing Trustee filed a timely appeal (the "Appeal") and cross appeal, respectively, of the *Opinion and Order* and the *Order Denying Motion for Reconsideration*. See *Notice of Appeal*, Docket No. 149; *Notice of Cross Appeal*, Docket Nos. 158 and 160. The appeal and cross appeal are pending before the U.S. District Court for the District of Puerto Rico in the case captioned Condado 5, LLC v. Vaqueria Las Martas Inc., Civil Case No. 20-01344 (D.P.R.).

9. On June 1, 2020, the Debtor filed a *Chapter 12 Payment Plan* (the "*Plan*", Docket No. 137) which proposes the following treatment for some of the collateral securing Condado's claim:

> III Condado 5 to be paid value of its secured claim #6 [$205,000 residence Paseo Esmeralda, Arecibo + $109,118 27.28 cuerdas Bo. Naranjio, Hatillo] @ $313,118 w/ 4.5% over principal x 15 yrs amortized claim @ $2,395.33 monthly for 15 years to be paid directly to Condado 5, or its assignees, by Suiza Dairy, commencing within 30 days from confirmation of Plan
>
> …
>
> VII The step up payments to the Plan are needed to allow debtor at least 6 months from the date of confirmation of the Plan and cessation of collection by Condado 5 of Debtor's milk profits from Suiza Dairy to increase current low milk production by retaining maximum revenue for operation of dairy farm for maximized payout to both the bankruptcy estate & to secured creditor, Condado.
>
> VIII Condado 5 shall forthwith cease collection of what has been 100% of Debtor's profits from milk sales to Suiza Dairy during more than two years to avoid further damage to Debtor's organization effort. With the funds which Condado 5 shall cease to collect forthwith, Debtor will fund its Plan and inject much needed capital into the operation and growth of its dairy farm for a successful reorganization effort.
>
> IX Condado 5 to immediately reimburse Debtor for the preferential payments made by Suiza Dairy to Condado 5 from September 15, 2018 through at least May 31st, 2020, [or until the monthly collection ceases] from the sale of Debtor's milk to Suiza Dairy Corporation.
>
> X The projections that support this Plan have factored in **the anticipated reimbursement of preferential payments collected by Condado 5 on milk sales not subject to its lien from Suiza Dairy in the approximate amount of at least $77,925 during the pendency of this case since December 2018 until May 2020 and those collected 90 days before the bankruptcy petition when Condado 5's UCC had already lapsed.** The reimbursement of these amounts are vital to the purchase of cows and the operation of the dairy farm in order to boost production which has suffered from severe stagnation as a result of payment to Condado 5 of 100% of its profits from the sale of milk for over two years, and no compensation to Debtor for its work effort

Id., p. 2, §§ III-X (emphasis added). See also *Projections in Support of Plan,* Docket No. 144.

10. To this effect, on August 11, 2020, the Debtor sent a letter to the undersigned requesting the reimbursement of the amounts collected by Condado throughout the pendency of the captioned case, which the Debtor alleges is close to $100,000.00. See letter by the Debtor dated August 11, 2020, **Exhibit I**.

11. Condado is the Debtor's largest secured creditor with an allowed claim in the

amount of $1,626,362.59. As explained above, the Loan in this case was <u>originally due (10) ten years ago</u>.

12. Thus, Condado hereby requests the Court to stay the *Opinion and Order* and the *Order Denying Motion for Reconsideration* as it will be irreparably harmed without such stay as further explained below. Additionally, Condado submits that the traditional four-part standard is met for the Court to grant the relief requested herein.

## Relief Requested

13. Condado requests entry of an order under Fed. R. Bankr. P. 8007 imposing a stay of the effectiveness of the *Opinion and Order* and of the *Order Denying Motion for Reconsideration* pending resolution of the Appeal.

## Applicable Law and Discussion

14. Fed. R. Bankr. P. 8007(a)(1) provides, in pertinent part, that "[o]rdinarily, a party must move first in the bankruptcy court for the following relief: (A) a stay of a judgment, order, or decree of the bankruptcy court pending appeal." Fed. R. Bankr. P. 8007(a)(1)(A).

15. Courts in our First Circuit apply the classic four-part standard applicable to preliminary injunctive relief under Fed. R. Bankr. P. 8007. See <u>Acevedo-Garcia v. Vera–Monroig</u>, 296 F.3d 13, 16 (1st Cir. 2002).

16. The Court must consider "(1) whether the applicant has made a strong showing of success on the merits; (2) whether the applicant will be irreparably harmed absent injunctive relief; (3) whether issuance of the stay will injure other parties; and (4) where the public interest lies." <u>Id.</u> at 16, n. 3.

17. "The *sine qua non* [of the stay pending appeal standard] is whether the [movants] are likely to succeed on the merits." <u>Elias v. Sumski (In re Elias)</u>, 182 Fed. Appx. 3, 4 (1st Cir. 2006, citing <u>Weaver v. Henderson</u>, 984 F.2d 11, 12 (1st Cir. 1993).

18. However, the degree of likelihood of success is not ultimately determinative and must be balanced with the hardships caused to the parties if the injunction is not granted. **If a**

-4-

**party's showing of probable success on the merits is uncertain, he may be entitled to a preliminary injunction if he demonstrates a strong probability that he will be injured if the court fails to act**. 11A Wright, Miller & Kane, Federal Practice and Procedure Civ. § 2948.3 (3rd ed. 2020), citing Williams v. San Francisco Unified School Dist., 340 F. Supp. 438 (N.D. Cal. 1972).

19. Thus, rather than requiring the moving party to establish that the trial court is likely to be reversed, "the movant must only establish that the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear." Canterbury Liquors & Pantry v. Sullivan, 999 F. Supp. 144, 150 (D. Mass. 1998). Also see Exxon Corp. v. Esso Worker's Union, Inc., 963 F.Supp. 58, 60 (D. Mass. 1997).

20. To establish irreparable harm, the movant does not need to show that the injunctive relief will be fatal to the business, only that its legal remedies are inadequate. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996). "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." In re Redondo Const. Corp., No. 02-02887 (ESL), 2010 WL 1286849, at *1 (Bankr. D.P.R. Mar. 30, 2010)

21. Therefore, "[w]hen implementing this test, the four factors are weighed according to the unique circumstances of each case to ensure a just result." Betteroads Asphalt, LLC v. FirstBank Puerto Rico, 2020 WL 3125274, at *5 (D.P.R. 2020).

22. "'What matters ... is not the raw amount of irreparable harm [a] party might conceivably suffer, but rather the risk of such harm in light of the party's chance of success on the merits" Id. at 6 (citing P.R. Hosp. Supply, Inc. v. Boston Scientific Corp., 426 F.3d 503, 507 n. 1 (1st Cir. 2005)).

23. Condado submits that each of the foregoing factors are met.

*i. Strong showing of success on the merits*

(A) The lien over the milk quota must consequently extend to the proceeds of such quota

24. Condado's appeal hinges on the Court's ruling in the *Opinion and Order* that the milk produced by Debtor's cows is not subject to Condado's collateral. The Court reasoned such conclusion on the fact that "Milk quotas do not produce milk. Since Condado's collateral does not include the cows, it may not claim that its security interest attaches to any identifiable proceeds of the cows." *Opinion and Order*, Docket No. 120, p. 16, line 21.

25. Condado submits that this Honorable Court's conclusion does not take into account how the milk industry operates and the extent of Condado's lien.

26. As a preliminary matter, it is undisputed that the *Security Agreement* filed with ORIL on January 21, 2005 affords a **continuing security interest** ("gravamen continuo e interés asegurado") in favor of Condado over the Debtor's production of 58,700 liters of milk every 14 days and that such continuing security interest is currently registered with ORIL in favor of Condado. See Docket No. 17-3, p. 3, § IV(1) and Docket No. 43-1.

27. Pursuant to the ruling of the highest State Court in Puerto Rico that has considered the matter, PR Asset Portfolio 2013-1 International LLC v. Tropical Heifers, Inc., 2017 PR App. LEXIS 1294 at **13-18, 2017 WL 2462052 (P.R. Ct. of Appeals 2017), Condado's registration of its lien with ORIL is sufficient to be valid and perfected pursuant to Article 11 of the PR Milk Quota Act , *infra*, 5 L.P.R.A. § 1135(a). Hence, Puerto Rico law allows this kind of lien, *i.e.*, the milk quota of milk produced every 14-days, to be perfected. This is an important factor to consider under Section 552(b) of the Bankruptcy Code, *infra*.

28. In this regard, the *Opinion and Order* ruled that "Condado has a valid lien over the milk quota since the inception of the contested matter." *Opinion and Order*, Docket No. 120, pp. 16-17, lines 12-2.

29. Thus, the matter under appeal relates to whether Condado's lien extends to the proceeds and production of the milk every 14 days or not.

30. In Puerto Rico, "[n]o producer, processor, or sterilizer of milk or its byproducts may operate without a license issued therefor by the Administrator [of ORIL]". 5 L.P.R.A. § 1101(a).

-6-

Hence, ORIL's Administrator may "grant or renew licenses after finding that the applicant has complied with the laws and regulations applicable in the Commonwealth of Puerto Rico relative to health and sanitation in milk production, processing, sterilizing, handling, and sale; and with all applicable provisions, in the proper case, of the law creating the Milk Industry Regulation Office and the regulations, orders or resolutions approved thereunder." 5 L.P.R.A. § 1101(b). The license results in a "milk quota", and dairy farmers are only paid by milk processing plants at a fixed price for all dairy farmers for milk they produce within their allowed quota **every 14 days**. When a dairy farmer's production exceeds the amount of their allowed quota, he/she is not paid by the milk processing plants for any milk that was produced above that quota limit.

31. Thus, by definition, the "total [milk] quota" allowed to a dairy farmer is the "[t]he amount of quarts of milk that the Office of the Milk Industry Regulation Administrator assigns to milk producers, to be produced **every fourteen (14) days**, in accordance with the market's needs". 5 L.P.R.A. § 1126(c) (emphasis added). "Every fourteen (14) days" implies a continuing lien.

32. The distinction between a dairy farmer's license and its milk quota must be emphasized. Dairy farmers in Puerto Rico may sell the milk they produce to anybody without necessarily having to process such sales through the registered milk quota. Accordingly, they can sell raw milk to a neighbor, another dairy farmer, to cheese or yogurt processors etc. None of those proceeds will be encumbered by the lien a creditor might have on their quota. In such circumstances, only a creditor with a lien over the cows would have a security interest over such proceeds.

33. However, when a dairy farmer opts to sell milk though to the milk processing plants through the encumbered milk quota and reap the benefits such quotas afford them (*i.e.*, guaranteed expedited payment, limit as to how much each dairy farmer can produce therefore exerting price control), we submit that the proceeds generated thereunder are equally encumbered by the very nature of such quota, regardless of whether the cow or the offspring of

-7-

such cow produced the milk.

34. Moreover, the registration of liens over milk quotas in Puerto Rico and **all related transactions** thereunder is governed by the PR Registry of Transactions of Production Quotas of the Milk Industry Act, PR Act No. 301 of September 2, 2000, 5 L.P.R.A. §§ 1126 *et seq.* (the "Milk Quota Act"). It is a highly specialized law that was enacted to create a registry of transactions of production quotas for milk producers in Puerto Rico under the Office of the Milk Industry Regulation (ORIL) Administrator to uniformly regulate all transactions and procedures related to milk production quotas.

35. The Exposition of Motives for the Milk Quota Act states its purpose and scope:

> Due to the present circumstances of the Puerto Rico Milk Industry, the production quotas authorized to milk producers have acquired great importance. **These quotas have turned into a movable property with an extraordinary value and into a financial resource appreciated by financial agencies and institutions** that offer credit to said producers.
>
> This situation warrants that all transactions related to said quotas be organized and regulated, in order to give more assurance to the participants of said transactions. **At present, transactions are being carried out before the Office of the Milk Industry Regulation Administrator and liens upon said quotas are being imposed**.
>
> The purpose of this Act is to uniformly regulate **all transactions** related to milk production quotas, and establish registration and processing proceedings for these transactions.

*Exposition of Motives*, PR Act No. 301 of September 2, 2000, P. de la C. 2598 (emphasis added).

36. Further, Article 11(a) of the Registry of the Milk Quota Act reads as follows: "Liens upon quotas subject them, directly and immediately to compliance with the obligation for the security of which they were constituted. Liens recorded in this registry shall constitute an effective encumbrance upon quotas, provided said liens were constituted or recorded in additional compliance with §§ 1221 et seq. of Title 19, which pertains to guaranteed transactions." 5 L.P.R.A. § 1135(a).

37. Based on the foregoing, it is Condado's position that the proceeds generated thereunder are equally encumbered by the very nature of such quota, regardless of whether the

cow or the offspring of such cow produced the milk. The lien on the quota is triggered not when the cow produces the milk, but when the dairy farmer chooses to sell such milk to a processing plant regulated by the quota system of ORIL.

38. The lien over the milk quota means that when the Debtor produces milk every 14 days, such production therefrom is encumbered through the quota. That is why Puerto Rico law distinguishes between registration with ORIL versus the UCC financial statement registration of accounts receivables.

39. Thus, Condado submits that a lien over the milk quota must consequently encumber the milk quarts that compose such quota.

40. We bring to the attention of the court that case law interpreting the Milk Quota Act is scarce and this issue is unsettled. We move the Court to consider this under its Rule 8007 analysis. See Canterbury Liquors & Pantry v. Sullivan, 999 F. Supp. at 150 (considering that "the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear").

41. Additionally, the *Security Agreement* duly registered with ORIL in compliance with the PR Registry of the Milk Quota Act (Proof of Claim No. 6, pp. 132-143; Docket No. 17-3, pp. 1-12) extends over the interests, rents and proceeds arising from the milk quotas and the continuing production of milk under the quotas every 14 days. See Security Agreement, Proof of Claim No. 6, p. 133, § II, p. 134, § IV(1) and p.135, ¶ 3; Docket No. 17-3, p. 2, § II, p. 3, § IV(1), p. 4, ¶ 3.

42. Therefore, Condado submits that the lien over the milk quota extends over the proceeds. Condado will now discuss the requirements for such lien to extend to the post-petition proceeds.

(B) *The exception in Section 552 of the Bankruptcy Code applies to the case at hand*

43. Section 552(a) of the Bankruptcy Code generally provides that property acquired by the bankruptcy estate post-petition is not subject to any lien resulting from a pre-petition

security agreement. See 11 U.S.C. § 552(a); Cadle Co. v. Schlichtmann, 267 F.3d 14, 19-20 (1st Cir. 2001) ("Under 11 U.S.C. § 552(a), '[p]roperty acquired ... by the debtor after the commencement of the case is not subject to any lien resulting from a security agreement entered into by the debtor before the commencement of the case.'")

44. But such general rule "does not apply to a secured party's lien on proceeds, **products**, offspring, rents, profits or hotel revenues generated from the original collateral **if the contract contains a provision to that effect**." In re National Promoters and Services, Inc., 499 B.R. 192, 205-206 (Bankr. D.P.R. 2013) (Lamoutte, B.J.), citing 11 U.S.C. § 552(b)(1), (2) (emphasis added). Bankruptcy courts within the District of Puerto Rico have analyzed the purpose of the exception afforded in Section 552(b) as follows:

> The purpose of Section 552(b) is to balance the Bankruptcy Code's interest in freeing debtors of pre-petition obligations against secured creditors' rights to maintain the interests in collateral for which they bargained. See Bankruptcy Law Manual, *op. cit.,* Volume 1, § 6:52, p. 1300; Financial Sec. Assurance v. Days Cal. Riverside Ltd. Pshp. (In re Days Cal. Riverside Ltd. Pshp.), 27 F.3d 374, 375 (9th Cir.1994), citing In re Bering Trader, Inc., 944 F.2d 500, 502 (9th Cir.1991) ("Section 552(b) balances the [Bankruptcy] Code's interest in freeing the debtor of pre-petition obligations with a secured creditor's rights to maintain a bargained-for interest in certain items of collateral."); United Virginia Bank v. Slab Fork Coal Co., 784 F.2d 1188, 1191 (4th Cir. 1986) ("It appears clear from the legislative history related to Section 552(b) that Congress undertook in that section to find an appropriate balance between the rights of secured creditors and the rehabilitative purposes of the Bankruptcy Code."); Matter of Village Properties, Ltd., 723 F.2d 441, 444 (5th Cir. 1984) ("[Section 552(b)'s] primary design is to permit creditors to take security interests in proceeds pursuant to applicable state law, such as U.C.C. Article 9 or whatever state law applies to security interests in real property. Section 552 reflects Congress' historical concern that property rights usually should be controlled by state law instead of the 'mere happenstance' of bankruptcy."). "[U]nder Section 552(b), a creditor has a separate security interest in rental income from its interest in the property securing the mortgage." In re South Side House, LLC, 474 B.R. at 414. As a result, a creditor "is entitled to adequate protection of two distinct interests: its mortgage on the property and its right to collect the rents flowing from the property or, at the very least, its security interest in such rents." Id. at 408, quoting Fin. Ctr. Assocs.,140 B.R. at 834.

In re National Promoters and Services, Inc., 499 B.R. at 206-207 (footnote omitted).

45. Accordingly, for the exception in Section 552(b) to apply, there must be: (a) a prepetition security agreement; (b) the agreement by its terms must extend to the debtor's prepetition property and to proceeds, product, offspring, or profits of such property; and (c) applicable non-bankruptcy law must permit the security agreement to extend to such after-acquired property. See In re National Promoters and Services, Inc., 499 B.R. at 207, citing 9C Am. Jur. 2d Bankruptcy § 2626 (2013). In other words, under Section 552(b), if Condado obtains a pre-petition security interest over the Debtor's continuing production of milk every 14 days and PR Law allows it, such security interest extends to post-petition proceeds to the extent provided in the security agreement. See In re Manuel Mediavilla, Inc., 505 B.R. 94, 100 (Bankr. D.P.R. 2014) (Caban, B.J.).

46. We submit that Condado complies with the three (3) requirements in Section 552(b) and thus, the Bankruptcy Court erred in determining that the post-petition proceeds from Debtor's milk production through the registered milk quota is not encumbered by Condado's lien.

47. As explained above, it is Condado's position that the continuing lien afforded in the *Security Agreement* extends to the proceeds of the milk quota. Therefore, Condado submits that the foregoing exception applies in this case because: (a) the *Security Agreement* was executed on January 12, 2005, that is, pre-petition (Proof of Claim No. 6, p. 143); (b) the lien afforded under the *Security Agreement* extends over the interests, rents and proceeds arising from the Debtor's milk quotas and the continuing production of milk thereunder every 14 days (Proof of Claim No. 6, p. 133, § II, p. 134, § IV(1) and p.135, ¶ 3; Docket No. 17-3, p. 2, § II, p. 3, § IV(1), p. 4, ¶ 3); (c) the *Security Agreement* was duly registered with ORIL in compliance with the PR Milk Quota Act. See *ORIL Certification* demonstrating that Condado has duly registered lien. See Docket No. 43-1.

48. Condado identified no case law addressing this matter. Thus, this case falls precisely within the type of cases that raise "serious and difficult questions of law in an area where the law is somewhat unclear." Canterbury Liquors & Pantry v. Sullivan, 999 F. Supp. 144, 150 (D.

Mass. 1998).

49. Therefore, Condado submits that its arguments in this area of law that federal courts have not considered meet the required standard of strong showing of success on the merits.

*ii. Whether the applicant will be irreparably harmed absent injunctive relief and the balance of equities*

50. Condado will suffer irreparable harm as a secured creditor unless the *Opinion and Order* and the *Order Denying Motion for Reconsideration* are stayed, especially considering the fact that the Debtor is now seeking the turnover of all amounts received by such secured creditor since the filing of the petition, which the Debtor alleges amounts to approximately $100,000.00.

51. As stated above, Condado's claim has been due and payable since 2015, with an original due date <u>ten (10) years ago</u>.

52. As a secured creditor, Condado is entitled to adequate protection of its interest in the milk quota and also on its cash collateral if it prevails in the Appeal. <u>See</u> <u>In re Gavia</u>, 24 B.R. 216, 217 (Bankr. E.D. Cal. 1982) ("Adequate protection must be afforded [to] the secured creditor as provided in 11 U.S.C. § 361. The legislative history defines adequate protection as follows: 'The concept is derived from the 5th Amendment protection of property interest ...' 'It is not intended to be confined strictly to the constitutional protection required, however. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain.'") <u>Also see</u> <u>In re AA 10000 Corp.</u>, 2007 Bankr. LEXIS 5091, at *6 (D.P.R. 2007) ("Adequate protection must be afforded to secured creditors who have an interest in property").

53. Since the matters on appeal in this case relate to whether or not Condado is entitled cash collateral and its additional adequate protection right thereover, without a stay pending appeal, Condado's interests will be irreparably harmed.

54. If Condado prevails in such Appeal, its cash collateral will be significantly depleted

without affording any adequate protection. Additionally, the Debtor has expressed its intention of seeking the turnover of all amounts received by Condado since the filing of this case.

55. The damage would be irreparable considering the fact that the Debtor filed the captioned petition due to insolvency. Thus, any monies received by the Debtor will be used for operations and/or its reorganization, leaving its largest secured creditor without payment or adequate protection and without the relief to seek such monies once the Appeal is concluded in light of the captioned petition and the Debtor's financial condition.

56. No other party would be harmed by the granting of this stay pending appeal as the stay would simply maintain the *status quo* while the Appeal is resolved and Condado would continue receiving payments, which it is entitled to receive as the largest secured creditor.

57. And if any other party may argue any harm, such harm is outweighed by Condado's irreparable harm in the depletion of its cash collateral and the lack of adequate protection, failure to receive post-petition payments, and in the litigation that will ensue regarding the turn-over of post-petition payments.

58. Therefore, Condado submits that the "irreparable harm" and "injure to other parties" factors are also satisfied for the Court to grant the relief requested herein.

*iii.    Where the public interest lies*

59. As stated above, "to obtain a preliminary injunction, a plaintiff must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Betteroads Asphalt, LLC v. FirstBank Puerto Rico, 2020 WL 3125274, at *5.

60. Thus, the remaining factor to be discussed is that the stay pending appeal is in the public interest.

61. In this regard, some courts have referred to this factor as "where the public interest lies." In re Otero Rivera, 532 B.R. 425, 426 (Bankr. D.P.R. 2015).

62. In the captioned case, the Loan had an original due date ten (10) years ago. The

Debtor is attempting to bypass Condado's lien over the milk quota entirely as stated in the *Plan*, in which the Debtor intends to pay Condado's secured portion only to the extent secured by Guarantor's collateral and basically declare Condado as an unsecured creditor, without so stating it and without complying with Fed. R. Bankr. P. 7001(2).

63.     Secured creditors have certain rights that must be safeguarded in the balance of the equities. Since the inception of this case, the Debtor alleges that Condado has been paid approximately $100,000.00 and intends to halt any and all payments to its largest secured creditor and seek the turn-over of such monies.

64.     Condado submits that it is in the public interest for a secured creditor to remain adequately protected and for its collateral to be safeguarded as well. Considering the current Appeal and the consequences of the *Opinion and Order* and the *Order Denying Motion for Reconsideration* not being stayed, Condado submits that it is in the public interest for a secured creditor to continue receiving payments and have its collateral and cash collateral (if Condado prevails in the Appeal) protected.

<u>Prayer for Relief</u>

WHEREFORE, Condado respectfully prays the Court to grant the stay of the *Opinion and Order* and the *Order Denying Motion for Reconsideration* pending a ruling on the Appeal and to grant any other relief it deems just and proper.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 15th day of September, 2020.

<u>Objection Language - PR LBR 9013-1(c)(1)</u>
Within fourteen (14) days after service as evidenced by the certification, and an additional three (3) days pursuant to Fed. R. Bank. P. 9006(f) if you were served by mail, any party against whom this paper has been served, or any other party to the action who objects to the relief sought herein, shall serve and file an objection or other appropriate response to this paper with the clerk's office of the United States Bankruptcy Court for the District of Puerto Rico. If no objection or other response is filed within the time allowed herein, the paper will be deemed unopposed and may be granted unless: (i) the requested relief is forbidden by law; (ii) the requested relief is against public policy; or (iii) in the opinion of the court, the interest of justice requires otherwise.

<u>Certificate of Service</u>

We hereby certify on this same date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case. Motions and orders processed through CM/ECF are "presumed to be served on the same date of the electronic filing". <u>P.R. Elec. Power Auth. v. Vitol, Inc.</u>, 298 F.R.D. 23, 26 (D.P.R.2014).



Attorneys for Condado
PO Box 195168
San Juan, PR 00919-5168
Tel.: (787) 766-7000
Fax: (787) 766-7001

<u>/s/ Sonia E. Colón</u>
SONIA E. COLÓN
USDC-PR No. 213809
scolon@ferraiuoli.com

<u>/s/ Gustavo A. Chico-Barris</u>
GUSTAVO A. CHICO-BARRIS
USDC-PR No. 224205
gchico@ferraiuoli.com

<u>/s/ Camille N. Somoza</u>
CAMILLE N. SOMOZA
USDC-PR No. 302908
csomoza@ferraiuoli.com