EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| PR Asset Portfolio 2013-1 International, LLC<br><br>Recurrido<br><br>v.<br><br>Tropical Heifers, Inc. y otros<br><br>Peticionarios | Certiorari<br><br>2021 TSPR 30<br><br>206 DPR ____ |

Número del Caso:  CC-2017-627


Fecha: 5 de marzo de 2021


Tribunal de Apelaciones:

    Región Judicial de Aguadilla y Arecibo, Panel XI


Abogado de la parte peticionaria:

    Lcdo. Pedro J. Rivera Rivera


Abogados de la parte recurrida:

    Lcda. Claudia C. Raffucci Pino
    Lcdo. Homero González López


Materia: Ley Núm. 301-2000, conocida como la Ley del Registro de Transacciones de Cuotas de Producción de la Industria Lechera, 5 LPRA sec. 1126 et seq.: Al amparo de la Ley Núm. 301-2000 y el Reglamento Núm. 6669 de 11 de junio de 2003 -previo a las enmiendas que sufrió en 2015- un gravamen sobre una cuota de producción de leche se entiende constituido y perfeccionado cuando: (1) se inscribe en el Registro de Transacciones de Cuotas adscrito a la Oficina de la Industria Lechera, y (2) se constituye o se inscribe conforme al Capítulo 9 de la Ley de Transacciones Comerciales. Satisfecho el primer requisito y constituido el gravamen según el Capítulo 9, resulta innecesario que el gravamen también se inscriba en el Registro de Transacciones Comerciales del Departamento de Estado para que se entienda perfeccionado.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

PR Asset Portfolio 2013-1
International, LLC

      Recurrido

        v.               CC-2017-0627     *Certiorari*

Tropical Heifers, Inc. y
otros

      Peticionarios

La Jueza Presidenta Oronoz Rodríguez emitió la Opinión del Tribunal

En San Juan, Puerto Rico, a 5 de marzo de 2021.

La industria lechera en Puerto Rico está estrictamente regulada. Además de poseer una licencia debidamente expedida por la Oficina para la Reglamentación de la Industria Lechera (ORIL),[1] los ganaderos en Puerto Rico están obligados a adquirir de ORIL una cuota de producción que determina cuántos cuartillos de leche cada uno podrá producir cada catorce (14) días. Para financiar sus operaciones, los ganaderos suelen ofrecer estas cuotas como colateral

---

[1] Mediante la *Ley para Reglamentar la Industria Lechera*, Ley Núm. 34-1957, 5 LPRA sec. 1092 <u>et seq</u>., según enmendada, la Asamblea Legislativa creó la Oficina para la Reglamentación de la Industria Lechera (ORIL) adscrita al Departamento de Agricultura. Conforme a esta ley, "[n]ingún productor, elaborador, o esterilizador de leche o de productos derivados de [e]sta podrá operar sin una licencia expedida para esos fines" por el Administrador de dicha Oficina. 5 LPRA sec. 1101.

CC-2017-0627                                                          2

a las instituciones financieras que ofrecen crédito a
dichos productores. Por tanto, las cuotas autorizadas de
producción lechera se han convertido en un bien mueble de
gran valor.[2]

En atención a ello, y la necesidad de proveer "mayor
seguridad a los participantes en estas transacciones",[3] el
legislador aprobó la *Ley del Registro de Transacciones de
Cuotas de Producción de la Industria Lechera*, 5 LPRA sec.
1126 et seq*.* (Ley Núm. 301-2000). Entre otros asuntos, esta
Ley estableció un mecanismo uniforme para constituir y
perfeccionar los gravámenes mobiliarios sobre las cuotas de
producción de leche y creó un Registro a esos efectos.

Nos corresponde aclarar qué requisitos establecían la
Ley Núm. 301-2000 y el Reglamento Núm. 6669 de 11 de junio
de 2003 (Reglamento Núm. 6669) para perfeccionar un
gravamen mobiliario sobre una cuota de producción de leche.[4]
En particular, debemos determinar si la referida ley y el
Reglamento correspondiente exigían que el acreedor
inscribiera ese gravamen tanto en el Registro de
Transacciones de Cuotas adscrito a la Oficina de la
Industria Lechera (Registro de la ORIL) como en el Registro
de Transacciones Comerciales del Departamento de Estado
(Registro de Transacciones Comerciales).

Debido a que ni la Ley Núm. 301-2000 ni el Reglamento

---

[2] Exposición de motivos, Ley Núm. 301-2000.
[3] Íd.
[4] El análisis en este caso no considera las enmiendas al referido
Reglamento que introdujo el Reglamento Núm. 8660 de 12 de noviembre de
2015. Lo anterior, debido a que al momento en que ocurrieron los hechos
que dieron lugar a esta controversia, el Reglamento Núm. 8660 de 12 de
noviembre de 2015 aún no había entrado en vigor.

CC-2017-0627                                                        3

vigente al momento de los hechos exigía que un acreedor inscribiera su gravamen sobre una cuota de producción de leche en el Registro de Transacciones Comerciales como requisito para perfeccionar un gravamen sobre cuotas de producción de leche, contestamos esta interrogante en la negativa.

Examinemos los hechos.

I

En mayo de 2004, el Sr. Iván A. Villamil Pérez compró a Muñiz Farm, Inc. (Muñiz Farm) una cuota de producción de leche de 25,000 cuartillos cada 14 días. Esta cuota de producción estaba gravada en primer rango en el Registro de la ORIL a favor del Banco Popular de Puerto Rico (BPPR). BPPR consintió a la transferencia y autorizó a la ORIL a sustituir el nombre de Muñiz Farm por el del señor Villamil Pérez, haciendo constar el gravamen a su favor.[5] Lo anterior se plasmó en un acuerdo intitulado *Transferencia de Cuota de Leche y Autorización para Mantener Gravamen de Cuota* que se presentó para inscripción en el Registro de la ORIL **el 5 de mayo de 2004**.

En diciembre del mismo año, el señor Villamil Pérez otorgó varios contratos de pignoración de cuotas de leche con tres compañías: Mill-Agro Fibers, Inc. (Mill-Agro), Nutrimix Feed Company, Inc. (Nutrimix) y Tropical Heifers, Inc. (Tropical). Mediante esos contratos se constituyeron

---

[5] Como parte de esta transacción, el señor Villamil Pérez asumió una deuda existente entre Muñiz Farm y BPPR. La deuda se desglosaba de la siguiente manera: $891,637.09 en concepto de préstamo a término y la suma de $25,000 de una línea de crédito, para un total de $916,637.09.

gravámenes sobre un total de 20,000 cuartillos pertenecientes al señor Villamil Pérez.

**El 21 de diciembre de 2004,** las partes contratantes presentaron los referidos contratos de pignoración para
inscripción en el Registro de la ORIL. Además, en esa misma fecha, inscribieron los gravámenes sobre las cuotas de leche en el Registro de Transacciones Comerciales mediante la presentación de las declaraciones de financiamiento correspondientes. De los términos acordados en los contratos de pignoración surgía que los gravámenes constituidos en virtud de estos serían de segundo rango.

En mayo de 2005, BPPR y el señor Villamil Pérez suscribieron un acuerdo intitulado *Cesión de Derechos y Constitución de Gravamen Mobiliario*. Mediante este contrato, se modificó el gravamen mobiliario existente para responder por un nuevo préstamo comercial que BPPR estaba presto a otorgarle al señor Villamil Pérez.

Así las cosas, **el 22 de junio de 2005** el señor Villamil Pérez y BPPR presentaron este contrato para inscripción en el Registro de la ORIL. Además, presentaron una declaración de financiamiento en el Registro de Transacciones Comerciales; ello, a los fines de registrar el gravamen sobre los 25,000 cuartillos de leche que el señor Villamil Pérez le compró a Muñiz Farm en mayo de 2004.

Posteriormente, el señor Villamil Pérez incumplió con los pagos que acordó realizar a Nutrimix, Mill-Agro y

CC-2017-0627                                                              5

Tropical al amparo de los contratos de pignoración. Por
tanto, estas tres compañías instaron una demanda sobre
cobro de dinero y ejecución de cuota lechera contra el
señor Villamil Pérez. En septiembre de 2006, los acreedores
demandantes obtuvieron una Sentencia a su favor; por tanto,
se celebró una subasta pública. A esta compareció Tropical
como único licitador, por lo cual se le adjudicaron las
cuotas de producción ascendentes a 20,000 cuartillos de
leche que se habían gravado en aseguramiento de la deuda.[6]
El resultado de la subasta no alcanzó a satisfacer la
totalidad de la Sentencia a favor de las tres compañías
acreedoras, por lo que correspondía al señor Villamil Pérez
el pago del remanente.

El 8 de junio de 2007, Mill-Agro, Nutrimix y Tropical
presentaron una Querella ante la ORIL en contra del señor
Villamil Pérez y BPPR mediante la cual solicitaron que se
rectificaran los rangos de los gravámenes sobre las cuotas
lecheras que ostentaban. Requirieron que se le diera
preferencia a su crédito sobre los gravámenes que poseía
BPPR, de manera que se les clasificara en primer rango.
Ello, debido a que los gravámenes a su favor fueron
inscritos tanto en el Registro de Transacciones Comerciales
como en el Registro de la ORIL antes de que BPPR
inscribiera su gravamen en el Registro de Transacciones
Comerciales.

---

[6] El Acta de Subasta expresó que según la *Certificación* que emitió la
ORIL y la *Orden de Embargo y Prohibición de Enajenar* que emitió el
Tribunal de Primera Instancia, dichas cuotas estaban gravadas en
segundo rango a favor de Mill-Agro, Nutrimix y Tropical. BPPR no fue
parte en ese pleito.

CC-2017-0627                                                          6

En junio de 2012, la ORIL declaró sin lugar la Querella. Según la ORIL, Tropical tenía el deber de verificar que no existía gravamen alguno inscrito en el Registro de la ORIL o en el Registro de Transacciones Comerciales. Añadió que Tropical en efecto tenía conocimiento de que su gravamen estaba en rango de segunda y aun así realizó la transacción con el señor Villamil Pérez. No obstante haber expresado todo lo anterior, la ORIL concluyó que no tenía jurisdicción para atender el reclamo de los querellantes.[7]

Así las cosas, en febrero de 2013 BPPR demandó a Tropical y al señor Villamil Pérez en cobro de dinero, gravamen preferencial sobre cuotas y ejecución de cuotas lecheras. Alegó que Tropical operaba una vaquería con una cuota de 20,000 cuartillos cada 14 días que -según surgía del Registro de la ORIL- continuaba gravada a su favor preferentemente. Añadió que, a partir de la ejecución de la sentencia y la adjudicación de las cuotas a favor de Tropical, ni el señor Villamil Pérez ni Tropical efectuaron pago alguno para satisfacer el crédito asegurado por el gravamen preferente a su favor. Por tanto, BPPR arguyó que tenía derecho a ejecutar la cuota lechera en posesión de Tropical debido a la falta de pago de su deudor, el señor Villamil Pérez, y en vista de que su crédito tenía primer rango.

---

[7] Específicamente, la ORIL concluyó que "[p]ara que proceda la súplica de la Parte Querellante, se requiere que un tribunal con jurisdicción lo ordene". *Resolución y Orden*, Apéndice, pág. 140.

CC-2017-0627                                                    7

Tropical contestó la demanda. Señaló que BPPR no perfeccionó el gravamen a su favor, según exige el artículo 11(a) de la Ley Núm. 301-2000, pues no presentó una declaración de financiamiento oportunamente ante el Registro de Transacciones Comerciales. Adujo que entre la fecha en que BPPR negoció con el señor Villamil Pérez y registró dicho acuerdo en la ORIL y cuando lo presentaron en el Registro de Transacciones Comerciales, Tropical ya había cumplido con ambos requisitos, por lo cual perfeccionó su gravamen con un rango preferente al de BPPR.

Además, Tropical insistió que la Ley Núm. 301-2000 establecía como requisito para constituir un gravamen sobre cuotas de leche que se inscribiera tanto en el Registro de la ORIL como en el Registro de Transacciones Comerciales. Recalcó que no tenía obligación alguna frente a BPPR con relación a la cuota de 20,000 cuartillos de leche que adquirió en pública subasta. Solicitó que, entre otras cosas, se desestimara la demanda y se ordenara la corrección del Registro de la ORIL.

En mayo de 2013, BPPR y PR Asset Portfolio 2013-1 International, LLC (PR Asset) presentaron una moción conjunta mediante la cual solicitaron la sustitución de BPPR por PR Asset como parte demandante en el pleito. El Tribunal de Primera Instancia autorizó dicha sustitución. Posteriormente, PR Asset solicitó el desistimiento sin perjuicio de la acción contra el señor Villamil Pérez. Tropical se opuso. Alegó, en síntesis, que el señor Villamil Pérez era parte indispensable. Así las cosas, el

CC-2017-0627                                                              8

Tribunal de Primera Instancia emitió una Sentencia Parcial resolviendo que este no era parte indispensable. Tropical no recurrió de dicha determinación.

Luego de varios trámites procesales, el foro primario emitió una Resolución en donde concluyó que el gravamen a favor de PR Asset –sucesor de BPPR– se inscribió correctamente en primer rango. Al interpretar el texto del artículo 11 de la Ley Núm. 301-2000, razonó que para inscribir un gravamen sobre una cuota de producción de leche se debía cumplir uno de los dos requisitos expuestos allí: inscribirlo en el Registro de la ORIL o constituirlo en cumplimiento con la Ley de Transacciones Comerciales. Expresó que "[p]ara el legislador el término constituido e inscrito **no son sinónimos** pues de haberlo sido solamente se hubiese incluido uno de ellos en el artículo 11 de la Ley 301".[8] Además, destacó que ni la Ley Núm. 301-2000 ni el Reglamento Núm. 6669 de la ORIL requerían evidencia de presentación de una declaración de financiamiento en el Registro de Transacciones Comerciales para inscribir un gravamen en el Registro de la ORIL.

En desacuerdo, Tropical solicitó reconsideración, pero el Tribunal de Primera Instancia denegó esta solicitud. Aún inconforme, Tropical acudió al Tribunal de Apelaciones mediante un recurso de *certiorari*. En lo pertinente, planteó que erró el foro primario al resolver que el artículo 11 de la Ley Núm. 301-2000 no requiere la doble

---

[8] Resolución del Tribunal de Primera Instancia, Apéndice, pág. 205.

CC-2017-0627                                                        9

inscripción de un gravamen para que este constituya una carga efectiva sobre una cuota de producción de leche.

El Tribunal de Apelaciones confirmó la Resolución recurrida. Al igual que el Tribunal de Primera Instancia, el foro apelativo intermedio enfatizó que el artículo 11 de la Ley Núm. 301-2000 utiliza la conjunción disyuntiva "o" al expresar que los gravámenes inscritos en el Registro de la ORIL constituirán una carga efectiva sobre una cuota lechera, siempre y cuando este se haya "constituido o inscrito" en cumplimiento adicional con la Ley Núm. 241-1996. Razonó que:

> [S]i la intención del legislador hubiera sido requerir el registro doble, bastaba con utilizar exclusivamente el vocablo 'inscrito', puesto que el mismo es lo suficientemente específico como para requerir referirse a otro término para el mismo fin […] De ahí que la interpretación más lógica y sensata es la acogida por el TPI, a los efectos de que el legislador quiso ofrecer con este lenguaje dos opciones: que se conforme el gravamen a los requisitos o requerimientos establecidos en el Registro de Transacciones del Departamento de Estado […] o que se registre en el [Registro de la ORIL].[9]

Insatisfecho con la Sentencia que emitió el Tribunal de Apelaciones, y luego de solicitar infructuosamente que reconsiderase, Tropical recurrió ante este Tribunal y reiteró los planteamientos que adujo ante los foros recurridos. Expedido el recurso y con el beneficio de la comparecencia de ambas partes, exponemos el derecho aplicable.

II

*A. El Registro de la ORIL*

---

[9] Sentencia del Tribunal de Apelaciones, Apéndice, págs. 517-518.

CC-2017-0627                                                      10

Según adelantamos, mediante la Ley Núm. 301-2000 la Asamblea Legislativa creó el Registro de la ORIL y estableció un procedimiento uniforme para constituir y registrar gravámenes mobiliarios sobre cuotas de producción de leche. Art. 3 de la Ley Núm. 301-2000, 5 LPRA sec. 1127. En lo pertinente, el artículo 11(a) de la Ley dispone que:

> El gravamen sobre la cuota la sujeta directa, e inmediatamente, al cumplimiento de la obligación para cuya seguridad fue constituido. Los gravámenes inscritos en este registro constituirán una carga efectiva sobre la cuota, **siempre y cuando** dicho gravamen se haya **constituido o inscrito en cumplimiento adicional** con las secs. 1221 et seq. del Título 19, relacionadas con las transacciones garantizadas.[10]

Asimismo, el artículo 11(e) de la Ley Núm. 301-2000, 5 LPRA sec. 1135, faculta al acreedor de un crédito vencido, garantizado por un gravamen sobre una cuota de leche, a ejecutar el mismo. Ello, luego de que el Tribunal de Primera Instancia emita una Sentencia y la orden de ejecución correspondiente sobre la cuota gravada.

Por su parte, el Reglamento Núm. 6669 establece cómo funcionará el Registro de la ORIL. En su artículo 6, dispone que "[e]l Registro llevará un diario de presentación, donde la licencia del ganadero constituirá la unidad registral. Se anotarán las presentaciones de los documentos de las transacciones, por orden cronológico de

---

[10] 5 LPRA sec. 1135 (Énfasis suplido). Interpretamos que al referirse a "las secs. 1221 et seq. del Título 19, relacionadas con las transacciones garantizadas" esta disposición alude a los requisitos que establece el Capítulo 9 de la Ley de Transacciones Comerciales, 19 LPRA secs. 2001-2207. Lo anterior, puesto que el único Capítulo de la Ley de Transacciones Comerciales que regula los gravámenes mobiliarios es el Capítulo 9. Además, destacamos que la Ley Núm. 301-2000, según aprobada por la Asamblea Legislativa, dispone que: "siempre y cuando dicho gravamen se haya constituido o inscrito en cumplimiento adicional con la Ley Núm. 241 de 19 de septiembre de 1996, relacionada con las transacciones garantizadas", es decir, el Capítulo 9.

CC-2017-0627                                                    11

la fecha y la hora […]."[11] Asimismo, el artículo 7.C del

referido reglamento dispone, en lo pertinente, lo

siguiente:

> Gravamen o Hipoteca de la Cuota
>
> 1. Toda Hipoteca de Cuota presentada en el
> Registro no será registrada, hasta tanto los
> documentos sean examinados y se verifique el
> estado de situación de la cuota que se está
> gravando.
>
> a. Si la cuota a gravarse posee un gravamen y
> otra entidad, persona o institución financiera
> desea gravar, **deberá presentarse una liberación
> de cuota para que el nuevo gravamen quede
> registrado. De no presentarse la liberación, la
> misma entrará en un rango inferior (2da. o 3ra.).**
> Si es un gravamen adicional con la misma entidad,
> éste debe especificar el rango.
>
> […] (Énfasis suplido).

De lo anterior podemos colegir que el rango de los

gravámenes sobre cuotas de producción de leche se determina

por razón de la fecha y hora en que se presentan los

documentos correspondientes en el Registro de la ORIL.

*B. La Ley de Transacciones Comerciales*

El Capítulo 9 de la Ley de Transacciones Comerciales,

Ley Núm. 208 de 17 de agosto de 1995, 19 LPRA secs. 401 <u>et</u>

<u>seq</u>. (Capítulo 9),[12] previo a su derogación en el 2012,[13]

establecía las normas que rigen las transacciones

garantizadas por propiedad mueble, es decir, los requisitos

para la constitución y perfeccionamiento de gravámenes

mobiliarios en nuestra jurisdicción. Véase <u>COSSEC v.</u>

---

[11] Reglamento Núm. 6669, pág. 3.
[12] El Capítulo 9 fue añadido al referido estatuto mediante la aprobación
de la Ley Núm. 241-1996, 19 LPRA secs. 2001-2207.
[13] La Asamblea Legislativa sustituyó el Capítulo 9 por un Capítulo 9
revisado cuando aprobó la Ley Núm. 21-2012, 19 LPRA secs. 2211-2409.

CC-2017-0627                                                          12

González López, 179 DPR 793, 801 n.2 (2010). Ya que al
momento de los hechos de este caso regía la Ley Núm. 208-
1995, corresponde aplicar los requisitos que la referida
Ley imponía en aquel momento en torno a la constitución y
perfeccionamiento de gravámenes mobiliarios. Ello, con
exclusión de las enmiendas que introdujo la Ley Núm. 96-
2009, 19 LPRA secs. 2104, 2108, y lo dispuesto por el nuevo
Capítulo 9 que aprobó la Asamblea Legislativa en el 2012.

No obstante, tanto la ley derogada que hoy nos ocupa
como sus iteraciones posteriores establecen dos momentos o
"pasos" fundamentales para que un gravamen mobiliario tenga
eficacia jurídica frente a otros acreedores garantizados
del deudor: su **constitución** ("attachment") y su
**perfeccionamiento**.

Por un lado, la constitución o "attachment" marca el
momento en que el gravamen mobiliario "se convierte en
exigible **contra el deudor** respecto a la propiedad gravada".
19 LPRA sec. 2053. La Sección 9-203 del Capítulo 9
establecía que una garantía mobiliaria requiere la
concurrencia de tres elementos para su **constitución:** (1)
que se haya dado valor a cambio; (2) que el deudor tenga
derechos sobre la propiedad gravada, y (3) que se cumpla
con una de tres posibles condiciones: (i) que la propiedad
gravada esté en posesión del acreedor garantizado en
conformidad con un acuerdo; (ii) que la propiedad gravada
sea inversiones y el acreedor garantizado tenga el control
a tenor de un acuerdo, o (iii) que el deudor haya firmado
**un acuerdo de constitución** de gravamen mobiliario que

CC-2017-0627                                                    13

contenga una descripción de la propiedad gravada. <u>Des.</u>
<u>Caribe v. Ven-Lour Enterprises</u>, 198 DPR 290, 302 (2017).

Una vez el acreedor cumple con estos requisitos y se
constituye el gravamen mobiliario propiamente, este
funciona como una garantía del crédito del acreedor y se
convierte en plenamente exigible frente al deudor, por lo
cual el acreedor podrá ejecutar el gravamen para hacer
valer su acreencia en caso de que el deudor incumpla con
los términos acordados.

No obstante, para que esta garantía sea oponible
frente a otros acreedores que hayan garantizado su crédito
mediante gravámenes sobre la misma propiedad del deudor la
Ley exige un paso adicional: el **perfeccionamiento** del
gravamen mobiliario. En particular,

> If a security interest has "attached", it is
> enforceable against the debtor (9-203(b)) as well
> as unsecured creditors (9-201(a)). In general, a
> secured party's security interest attaches when
> the secured party has given value, the debtor has
> rights in the collateral and the debtor has
> authenticated a security agreement that provides
> a description of the collateral. **However, for a**
> **security interest to have the most favorable**
> **status with respect to third party claimants,**
> **such as other secured parties, buyers and lien**
> **creditors, it must be perfected.** "Perfection" is
> a legal conclusion indicating that a security
> interest is enforceable against a third party.[14]

El momento en que un acreedor garantizado perfecciona
su gravamen determina la prioridad o el rango que ostentará
su crédito con relación a los otros acreedores garantizados
que también hayan constituido gravámenes sobre la misma
propiedad del deudor. A esos efectos, la Sección 9-

---

[14] Véase William D. Warren & Steven D. Walt, <u>Commercial Law</u> (9na ed.
2013).

CC-2017-0627                                                          14

312(5)(a) disponía que, salvo por contadas excepciones, "los gravámenes mobiliarios conflictivos tendrán rango para fines de prioridad de acuerdo con la fecha de su **registro o perfección**".[15]

### III

Según adelantado, la controversia medular en este caso se reduce a resolver qué requisitos imponía la Ley Núm. 301-2000 y el Reglamento Núm. 6669 para perfeccionar un gravamen sobre una cuota de producción de leche. Al interpretar el artículo 11(a) de la Ley, los foros recurridos entendieron que el uso de la conjunción "o" en el artículo provee dos medios independientes para constituir un gravamen sobre una cuota de producción de leche: registrar el gravamen en el Registro de la ORIL o presentar una declaración de financiamiento ante el Registro de Transacciones Comerciales. Basado en lo anterior, resolvieron que BPPR y su sucesor PR Asset perfeccionaron su gravamen sobre la cuota de producción en cuestión **antes** que Tropical, a pesar de que este último registró su gravamen en el Registro de la ORIL y en el

---

[15] Los requisitos para perfeccionar gravámenes mobiliarios al amparo de la Ley de Transacciones varían dependiendo del tipo de colateral sobre el cual recaiga el gravamen. La Sección 9-302 de la Ley Núm. 241-1996 establecía la norma general de que "[t]endrá que registrarse una declaración de financiamiento para perfeccionar todos los gravámenes mobiliarios […]". 19 LPRA sec. 2012 (Énfasis suplido). Véase James J. White, Robert S. Summers & Robert A. Hillman, UCC Practitioner Treatise Series, Vol. 4, §31:10 (6ta ed. 2015) ("Security interests can be perfected in four ways. The first, and by far the most common and important method, is the filing of a financing statement. This document contains only enough information to notify a reader that the creditor named may claim an interest in the described collateral of the debtor […] A second method -one that *may* be used with respect to certain kinds of collateral and that *must* be used with respect to cash- is creditor possession of the collateral.").

CC-2017-0627                                                    15

Registro de Transacciones Comerciales previo a que BPPR lo inscribiera en este último.

Consideramos que el Tribunal de Primera Instancia y el Tribunal de Apelaciones llegaron al resultado correcto al resolver así. Es decir, coincidimos con los foros recurridos en que ni la Ley Núm. 301-2000 ni el Reglamento Núm. 6669 exigían en aquel momento que un gravamen sobre cuotas de producción de leche se inscribiera tanto en el Registro de la ORIL como en el Registro de Transacciones Comerciales para perfeccionarse. No obstante, para justificar este resultado frente a los argumentos que aduce Tropical, procede corregir algunos aspectos del análisis estatutario que realizaran estos tribunales.

Primero, del texto del referido artículo 11(a) surge con meridiana claridad que el legislador impuso **dos condiciones separadas** para constituir y perfeccionar un gravamen sobre una cuota de producción de leche. La primera frase del referido artículo recoge el primer requisito: "Los gravámenes inscritos **en este registro** constituirán una **carga efectiva** sobre la cuota [...]". Art. 11(a) de la Ley Núm. 301-2000, supra. Por tanto, el primer paso para constituir el tipo de gravamen que nos concierne es, precisamente, que el acreedor inscriba su derecho en el Registro de la ORIL, con sujeción a los demás requisitos impuestos en la Ley y el Reglamento.

Ahora bien, la frase siguiente impone una segunda condición al disponer que el acto de inscripción en el Registro de la ORIL será suficiente para lograr la

CC-2017-0627                                                    16

constitución del gravamen **"siempre y cuando** dicho gravamen
se haya constituido o inscrito **en cumplimiento adicional**
con la Ley Núm. 241-1996". Art. 11(a) de la Ley Núm. 301-
2000, <u>supra</u>. Ante este lenguaje, difícilmente podemos
concluir, como hicieron los foros recurridos, que el
legislador quiso ofrecer dos opciones independientes al
acreedor que interesa constituir un gravamen sobre cuotas
de producción de leche.

Por un lado, la frase **"siempre y cuando"** nos adelanta
que el registro del gravamen en la ORIL surtirá efecto en
la medida en que también se cumpla con la condición
esbozada inmediatamente después. El uso de la frase "en
cumplimiento **adicional"** apoya esta interpretación. Por
tanto, al emplear la frase **"siempre y cuando"**, el
legislador sujetó la efectividad de un gravamen inscrito en
el Registro de la ORIL a que este se "constituya o
inscriba" en conformidad con el Capítulo 9.

Por tanto, no es correcto el análisis de los foros
recurridos en la medida en que concluyen que el artículo
11(a) de la Ley Núm. 301-2000 provee dos alternativas
_independientes_ para constituir un gravamen sobre cuotas de
producción de leche. Según expuesto, el referido artículo
impone dos condiciones distintas: que el gravamen (1) se
inscriba en el Registro de la ORIL y (2) se constituya o
inscriba en conformidad con el Capítulo 9. El uso de la
conjunción "o" en la segunda condición ofrece al acreedor
dos maneras de cumplir con esta, pero no obvia la primera
condición.

CC-2017-0627                                                    17

Aclarado lo anterior, pasemos a considerar si BPPR -antecesor de PR Asset- cumplió con ambas condiciones. En primer lugar, no está en controversia que BPPR en su momento inscribió el gravamen en el Registro de la ORIL. Por tanto, cumplió la primera condición.

Para determinar si BPPR cumplió con la segunda condición, tenemos que atender el significado de los términos "constituir" e "inscribir" al amparo del Capítulo 9. Lo anterior, tomando en consideración que realizar cualquiera de los dos según dispone el Capítulo 9 sería por sí suficiente para cumplir la segunda condición que establece el artículo 11(a) de la Ley Núm. 301-2000. Vimos que el Capítulo 9 dispone unos requisitos relativamente laxos para la constitución de un gravamen mobiliario; en términos generales, únicamente se requiere que: (1) el deudor tenga derechos sobre la propiedad gravada, (2) el acreedor haya dado valor a cambio; y (3) que se cumpla con una de tres posibles condiciones, entre ellas que el deudor haya firmado **un acuerdo de constitución** de gravamen mobiliario que contenga una descripción de la propiedad gravada. Véase Des. Caribe v. Ven-Lour Enterprises, 198 DPR 290, 302 (2017).

BPPR -y por consecuencia, PR Asset- cumplió con estos requisitos, pues (1) el señor Villamil Pérez era dueño de las cuotas de producción de leche que gravó a favor de BPPR; (2) BPPR ofreció un préstamo ("valor") al señor Villamil Pérez en consideración al referido gravamen, y (3) BPPR y el señor Villamil Pérez suscribieron un acuerdo de

CC-2017-0627                                                        18

constitución de gravamen mobiliario que describió adecuadamente la propiedad gravada.[16] Cabe resaltar que el acuerdo posterior mediante el cual BPPR y el señor Villamil Pérez modificaron el gravamen existente también cumplió con este requisito.[17]

En otras palabras, aunque BPPR no inscribió su gravamen en el Registro de Transacciones Comerciales, sí cumplió con la exigencia de que el gravamen a su favor quedara **constituido** en conformidad con el Capítulo 9. Esto, de por sí, era suficiente para cumplir con la segunda condición que impone el artículo 11(a) de la Ley Núm. 301-2000 para constituir y perfeccionar un gravamen sobre cuotas de producción de leche.[18] Debido a que la Ley Núm. 301-2000 constituye la ley especial sobre la materia, basta con verificar que se cumplieron los requisitos que esta impone para concluir que se perfeccionó el gravamen en cuestión. Córdova & Simonpietri v. Crown American, 112 DPR 797, 800 (1982).

---

[16] *Transferencia de Cuota de Leche y Autorización para Mantener Gravamen de Cuota*, Apéndice, págs. 49, 51 ("Las obligaciones del Deudor bajo este Contrato, el Pagaré y los otros Documentos de Préstamo estarán garantizados mediante la siguiente garantía y/o Colateral: […] Gravamen mobiliario sobre cuentas por cobrar que surjan de la producción de leche en virtud de la licencia 8099 y sobre la cuota de 25,000 cuartillos, en primer rango, que tiene inscrita a su nombre en la Oficina de Reglamentación de la Industria Lechera, suscrito por don Iván Villamil Pérez, suscrito el día 22 de junio de 2005, mediante el Affidávit número 20,728 ante el Notario Luis M. Ferrer Dávila").

[17] *Cesión de Derechos y Constitución de Gravamen Mobiliario*, Apéndice, pág. 70 ("En adición la DEUDORA ha acordado imponer un gravamen mobiliario sobre la cuota lechera que tiene inscrita a su favor en la Oficina de Reglamentación de la Industria Lechera de la siguiente forma: Gravamen en primer rango sobre VEINTICINCO MIL (25,000) cuartillos de cuota lechera").

[18] Interpretamos que el artículo 11(a) de la Ley Núm. 301-2000, al disponer que "[l]os gravámenes inscritos en este registro constituirán una carga efectiva sobre la cuota", además de disponer cómo se constituyen estos gravámenes, también vincula en cuanto a cómo perfeccionarlos. El artículo 7.C del Reglamento Núm. 6669, supra, confirma esta interpretación.

CC-2017-0627                                                    19

Destacamos que mediante la aprobación del Reglamento Núm. 8660 de 12 de noviembre de 2015 (Reglamento Núm. 8660) se añadió el requisito que hasta entonces estaba ausente en la Ley Núm. 301-2000. A esos efectos, la Sección 7 del Reglamento Núm. 8660 especificó lo siguiente:

> En cumplimiento con la Ley Núm. 241 de 19 de septiembre de 1996, según enmendada, conocida como "Ley de Transacciones Comerciales" y la Ley Núm. 301 del 2 de septiembre de 2000, toda entidad bancaria, institución financiera o persona natural o jurídica, **tendrá que proveer copia de la Declaración de Financiamiento del Departamento de Estado o de la Enmienda a la Declaración de Financiamiento.**

IV

Por los fundamentos que anteceden, se confirman las sentencias recurridas y se devuelve el caso al Tribunal de Primera Instancia para que continúen los procedimientos en conformidad con lo resuelto aquí.

Se dictará Sentencia de conformidad.

Maite D. Oronoz Rodríguez
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

PR Asset Portfolio 2013-1
International, LLC

      Recurrido

        v.               CC-2017-0627       *Certiorari*

Tropical Heifers, Inc. y
otros

      Peticionarios

SENTENCIA

En San Juan, Puerto Rico, a 5 de marzo de 2021.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se confirman las sentencias recurridas y se devuelve el caso al Tribunal de Primera Instancia para que continúen los procedimientos en conformidad con lo resuelto aquí.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres disiente con opinión escrita a la que se unen la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Estrella Martínez. El Juez Asociado señor Kolthoff Caraballo no intervino.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

PR Asset Portfolio
2013-1 International, LLC

 Recurrido

  v.     CC-2017-0627

Tropical Heifers, Inc.
y otros

 Peticionarios

Opinión disidente emitida por el Juez Asociado señor MARTÍNEZ
TORRES, a la que se unen la Jueza Asociada señora PABÓN CHARNECO y
el Juez Asociado señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 5 de marzo de 2021.

Disiento muy respetuosamente de la Opinión que
suscribe este Tribunal. Tras un análisis de las
disposiciones en controversia, entiendo que el
propósito del legislador al adoptar el Art. 9 de la
Ley de Transacciones Comerciales, 19 LPRA sec. 401
et seq. (en adelante, TLC) y el Art. 3 de la Ley del
Registro de Transacciones de Cuotas de Producción de
la Industria Lechera, 5 LPRA sec.1127 (en adelante,
Registro de la ORIL) fue crear un sistema uniforme,
tanto en el Registro de Transacciones Comerciales,
como en el Registro de la ORIL.

Por lo tanto, cónsono con ese fin de
uniformidad, resulta forzoso resolver que el
objetivo

CC-2017-0627                                                              2

del legislador fue requerir que para que una cuota de leche surta efecto en el Registro de la ORIL se tiene que registrar también en el Registro de Transacciones Comerciales.

I

En este caso, PR Asset – sucesor de Banco Popular de Puerto Rico- autorizó una modificación de un préstamo comercial a favor del señor Iván A. Villamil Pérez. Como garantía de dicho crédito, se pignoró una cuota de producción de leche de 25,000 cuartillos cada 14 días. Dicha transacción se presentó para su debida inscripción en el Registro de la ORIL Y obtuvo el primer rango. Sin embargo, PR Asset inscribió su crédito en el Registro de Transacciones Comerciales después que varios acreedores inscribieran su crédito sobre la misma cuota de producción de leche. Eso provocó una disputa sobre la prelación del crédito entre los acreedores.

Para resolver la disputa ante nuestra consideración debemos interpretar *el propósito*, y *la intención* del legislador al establecer el Registro de la ORIL y si este es consonó con la interpretación que la Opinión le da al Art. 3 de la Ley Núm. 301-200, 5 LPRA sec. 1127.

En primer lugar, veamos el texto que estamos llamados a interpretar. El Art. 11(a) de la Ley Núm. 301-200, supra, dispone:

El gravamen sobre la cuota la sujeta directa, e inmediatamente, al cumplimiento de la obligación para cuya seguridad fue constituido. Los

CC-2017-0627                                                                      3

> gravámenes inscritos en este registro constituirán
> una carga efectiva sobre la cuota, **siempre y
> cuando dicho gravamen se haya constituido o
> inscrito en cumplimiento adicional** con las secs.
> 1221 et seq. del Título 19, relacionadas con las
> transacciones garantizadas.[19]

La Opinión correctamente reconoce que para la debida inscripción de la cuota de leche en el Registro de la ORIL se tiene que cumplir con dos condiciones: (1) la inscripción en el Registro de la ORIL y (2) que se haya "constituido o inscrito" en cumplimiento con los requerimientos del Capítulo 9.

Ahora bien, somos del criterio que la intención del legislador al utilizar la conjunción "o" entre "constituido o inscrito" fue requerir que se inscribiera el gravamen de cuota de leche en ambos registros. Varias razones militan en favor de tal criterio.

La Asamblea Legislativa adoptó la LTC[20] **para simplificar, clarificar y modernizar el Derecho que rige las transacciones comerciales, uniformar el Derecho entre las diversas jurisdicciones existentes y permitir la continua expansión de las prácticas comerciales.** Sec. 1-102 de la Ley Núm. 208-1995, (19 LPRA sec. 401). Véase, además, la Exposición de Motivos de la Ley de Transacciones Comerciales, Le Núm. 208-1995 (1995 (Parte 1) Leyes de Puerto Rico 1012). Con dicho propósito en mente, en el 1996

---

[19] En lo pertinente, "las secs. 1221 et seq. del Título 19, relacionadas con las transacciones garantizadas" se refiere a los requisitos del Capítulo 9 de la Ley de Transacciones Comerciales, 19 LPRA secs. 2001-2207.

[20] Al momento de los hechos del caso ante nuestra consideración regía la Ley Núm. 208-1995, según enmendada, conocida como Ley de Transacciones Comerciales (en adelante, TLC),19 LPRA sec. 401 et seq.

CC-2017-0627                                                        4

el legislador adopto el Artículo 9 del Uniform Commercial
Code (en adelante, UCC) como el Capítulo 9 de Transacciones
Garantizadas de la LTC. Ley Núm. 241 de 19 de septiembre de
1996, 19 LPRA sec. 2001 et seq. Como se desprende, al
introducir en nuestra jurisdicción las disposiciones del
UCC, en específico, el Capítulo 9, el legislador buscó la
simplificación y uniformidad de las transacciones
comerciales en nuestra jurisdicción. Eso incluye las
transacciones relativas a las cuotas de leches.

De igual manera, al establecer el Registro de la ORIL
el legislador expresó que "**mediante esta ley se pretende
regular de manera uniforme todas las transacciones
relacionadas con las cuotas de producción de leche,** y
establecer un procedimiento a seguirse en su registro y en
la tramitación de todas estas transacciones." Exposición de
Motivos de la Ley Núm. 301-2000 (2000 (Parte 2) Leyes de
Puerto Rico 170-400, conocida como la Ley del Registro de
Transacciones de Cuota de Producción de la Industria
lechera.

Como podemos ver, queda demostrada la clara intención
del legislador de armonizar las disposiciones de la LTC y el
Registro de ORIL, al condicionar la efectividad del gravamen
en el registro de la cuota de leche en el Registro de la
ORIL "**siempre y cuando**" dicho gravamen se haya "**constituido
o inscrito en cumplimiento adicional**" con las secs. 1221 et
seq. del Título 19. Se advierte con facilidad al leer el
estatuto, que el legislador quiso sujetar la eficacia del

CC-2017-0627                                                    5

gravamen a que este se registrara tanto en el Registro de la
ORIL como en el de Transacciones Comerciales. Lo contrario
sería crear dos registros dispares, contraviniendo el
propósito legislativo de **regular de manera uniforme todas
las transacciones relacionada con las cuotas de producción
de leche.**

Dicho proceder no es un capricho ni una intromisión a
la facultad del legislador. Todo lo contrario, buscamos
armonizar el propósito, intención y objetivo del legislador
con el lenguaje del estatuto en disputa. Hemos establecido
que, ante un lenguaje confuso, el Art. 7 del Código Civil de
Puerto Rico, 31 LPRA sec. 7, asigna a los tribunales el
deber de aclarar las lagunas o áreas oscuras en la ley, con
el fin de cumplir con el propósito legislativo. En Brau,
Linaraes v. ELA et als. 190 DPR 315 (2014), resumimos el
análisis a llevarse a cabo a la hora de interpretar un
estatuto. Establecimos que:

> [A]l interpretar un estatuto, hay que proveer un
> sentido lógico a sus diversas disposiciones y
> suplir posibles deficiencias cuando sea necesario.
> Alonso García v. S.L.G., 155 DPR 91, 99-100 (2001);
> Sucn. Álvarez v. Srio. de Justicia, 150 DPR 252
> (2000); Pueblo v. Ferreira Morales, 147 DPR 238,
> 267 (1998). De surgir alguna ambigüedad en el texto
> del estatuto, los tribunales deben asegurarse de
> que la interpretación cumple con los propósitos
> legislativos. Morales et als. v. Marengo et al.,
> 181 DPR 852, 859 (2011). Para esto, es menester
> considerar cuáles fueron los propósitos perseguidos
> por la Asamblea Legislativa al aprobar la ley. La
> interpretación debe atribuirle un sentido que
> asegure el resultado que originalmente se quiso
> obtener. Para ello, auscultamos la Exposición de
> Motivos, la cual generalmente recoge el propósito
> que inspiró su creación. Pueblo v. Zayas Rodríguez,

CC-2017-0627                                                        6

147 DPR 530, 539 (1999). Brau, Linaraes v. ELA et
als., supra, págs. 338-339.

En esa dirección, hemos expresado que cuando exista
alguna ambigüedad sobre un texto legal, el tribunal
rechazará una interpretación forzada que conduzca a un
resultado que no puede haber sido el que se intentó por el
legislador. Pueblo v. Zayas Rodriguez, 147 DPR 530 (1999).

Ahora bien, en cuento al uso de las conjunciones y/o,
la conjunción "o" podrá ser intercambiada con la conjunción
"y", o viceversa, cuando ello sea necesario para llevar a
cabo el propósito evidente del legislador. Perez,Pellot v.
JASAP, 139 DPR 588, 597-598 (1995), citando a Pueblo v.
Colón Rosa, 96 D.P.R. 601 (1968); De Castro v. Junta de
Comisionados, 57 D.P.R. 153 (1940); Monllor & Boscio, Sucrs.
v. Sancho Bonet, Tes., 49 D.P.R. 576 (1936). Véase además,
United States v. Fisk, 70 US 445, 447 (1865) ("**In the
construction of statutes, it is the duty of the court to
ascertain the clear intention of the legislature. In order
to do this, courts are often compelled to construe 'or' as
meaning 'and,' and again 'and' as meaning 'or.'**"). Énfasis
suplido.

Por otro lado, es un principio reiterado que las leyes
no han de interpretarse tomando aisladamente algunas de sus
secciones, párrafos u oraciones, sino que deben serlo
tomando en consideración todo su contexto. González
Hernández v. González Hernández, supra, pág. 764. De igual
forma, el análisis que realice el tribunal debe evitar un

CC-2017-0627                                                    7

literalismo simplista que conlleve consecuencias absurdas;
la interpretación debe ser razonable y consecuente con el
texto y el propósito legislativo. Véase, Pueblo v. Mantilla,
71 DPR 36, 43-44 (1950).

Por ello, si entre dos interpretaciones textuales una
es cónsona con la validez de la ley, a ella se debe ceñir la
función judicial. P.S.P. v. Com. Estatal de Elecciones, 110
DPR 400, 456 esc. 2 (1980), Opinión concurrente del Juez
Asociado señor Díaz Cruz.

II

La Opinión resuelve que no es un requisito inscribir el
gravamen en el Registro de Transacciones Comerciales para
que este surta efecto en el Registro de la ORIL, por
entender que es suficiente con haber firmado el acuerdo de
constitución para estar en cumplimiento con la exigencia del
Art. 11(a) de la Ley Núm. 301-200. Lo anterior se basa en
una aplicación literal del disyuntivo "o" entre "constituido
o inscrito". Veamos si dicha aplicación es cónsona con el
propósito, la intención y el objetivo del legislador o si,
por el contrario, en esta ley "o" en realidad significa "y".

El doctor Farinacci Fernós, en su reciente publicación
de hermenéutica, nos presenta la distinción entre el
propósito, y la intención que el legislador tiene al momento
de redactar un estatuto. Nos define el propósito estatutario
como "las razones que motivaron al legislador a adoptar
determinada medida; es decir, las ideas, preocupaciones o
motivaciones del legislador que lo llevaron a aprobar una

CC-2017-0627                                                8

ley u otro texto normativo" J. Farinacci Fernós,
Hermenéutica puertorriqueña: Cánones de interpretación
jurídica, Ed. InterJuris, 2020, pág. 181. En la situación
ante nuestra consideración, se desprende con facilidad que
el propósito del legislador fue uniformar y simplificar la
regulación y comercio de las cuotas de leches. Es por ello
que creó el registro especializado en gravámenes de cuotas
de leches.

Por otro lado, el autor nos define la intención como lo
que "el legislador quiso o trató de hacer,
independientemente de su grado de éxito" Íd., pág. 182. De
igual manera, el autor sugiere que ante una deficiencia
entre la intención y el efecto del estatuto, siempre que
ello sea posible sin variar el texto de la ley, "los
tribunales deben procurar conciliar la intención subjetiva
con el contenido comunicativo y el efecto normativo". Íd.
Queda claro que la intención del legislador fue "regular de
manera uniforme todas las transacciones relacionadas con las
cuotas de producción de leche, y establecer un procedimiento
a seguir en su registro y en la tramitación de todas estas
transacciones". Exposición de Motivos de la ley del Registro
de Transacciones de Cuotas de Producción de la Industria
Lecherea, supra. Esto busca darle mayor seguridad a los
participantes en estas transacciones. Por ende, concluyo que
el significado del texto del Art. 11(a), supra, es que para
que una cuota de leche surta efecto en el Registro de la
ORIL se tiene que constituir conforme con el Capítulo 9 de

CC-2017-0627                                                           9

la Ley de Transacciones Comerciales, _supra_, y se tiene que
registrar también en el Registro de Transacciones
Comerciales.

Ahora bien, el resultado al que llega la Opinión del
Tribunal frustra la intención del legislador al permitir que
coexistan dos registros con información diferente, aunque en
ambos se inscribe la misma transacción. Esto choca con el
propósito de uniformar los procedimientos relacionados a las
cuotas de leche.

La existencia de dos registros con información distinta
sobre la misma actividad económica trae consigo
consecuencias adversas para la prestación de crédito en
nuestra economía. En primer lugar, socava la seguridad del
tráfico económico ante la incertidumbre que provoca entre
los participantes del comercio el no saber, fácilmente y con
certeza, qué protección tiene su crédito frente a otro. Esta
incertidumbre inevitablemente encarece la prestación de
crédito porque impone unos costos adicionales de
verificación a los prestamistas o compradores de cuotas de
leches, que se traducen en intereses elevados en el caso de
la prestación de crédito y en la merma del valor de las
cuotas de leche en el de los compradores. Esto perjudica a
los titulares de las cuotas. Lo anterior será nefasto para
nuestra industria lechera, al afectar desproporcionadamente
a los ganaderos. A estos se les hará más onerosa la
obtención de crédito para el desarrollo de sus empresas.

CC-2017-0627                                                    10

Por lo tanto, para propiciar el desarrollo de la industria lechera no pueden coexistir registros inexactos. Primero, ello contraviene el propósito e intención del legislador y segundo, precisamente por eso esa conclusión no es la lectura más armoniosa del texto del estatuto, cuya redacción no es la más clara. Tercero, como discutimos, hace onerosa la obtención de financiamiento para los ganaderos, al provocar que la banca tenga que hacer diligencias adicionales para cerciorarse de que la cuota a gravarse esté debidamente inscrita en los dos registros, ante la coexistencia independiente de ambos y la inexactitud que crea la diferencia de contenido entre ellos.

Por todo lo expuesto, disiento muy respetuosamente de la determinación del Tribunal.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado